# Exhibit A

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF RICHMOND

-------------------------------------------------------------------------X

In the Matter of

WILLIAM CALDARERA,                                             Index No. 85061/2026

                                   Petitioner,

               -against-                                       **AMENDED**
                                                               **VERIFIED PETITION**

NEW YORK SHIPPING ASSOCIATION and APM
TERMINALS LLC,

                                   Respondents,


Pursuant to CPLR Article 75.

-------------------------------------------------------------------------X


        Plaintiff, as and for his Amended Petition against Respondents, alleges, by his attorneys,

Advocates for Justice, Chartered Attorneys, as follows:


## INTRODUCTION

        1.      This is an action seeking to vacate a decision, framed by Respondents as an

arbitration award. This Petition is in part based on the lack of due process at the arbitration

hearing, and, in part, because of the breach of the duty of fair representation by Plaintiff's union,

the International Association of Longshoremen.


## JURISDICTION AND VENUE

        2.      This lawsuit is brought pursuant to CPLR Article 75 et seq. Defendants New York

Shipping Association and APM Terminals LLC do business in the State of New York.

        3.      Venue is based on Plaintiff's residence, which is at 52 East Scranton Avenue,

Staten Island, NY  10308.

## PARTIES

4.      Plaintiff, William Caldarera, is a resident of Richmond County, New York.  He is a member of International Longshoreman's Association, Local 1 ("Local 1"), and at all relevant times was represented by Local 1 for collective bargaining purposes. At all relevant times he was an employee of Defendant APM Terminals LLC.

5.      Defendant New York Shipping Association (hereafter "NYSA") is a Trade Association which bargains collectively for numerous waterfront terminal operators in the NY Harbor area, including APM Terminals LLC. NYSA is located at 333 Thornall Street, Suite 3A, Edison, New Jersey 08837

6.      Defendant APM Terminals LLC (hereafter "APM") is an employer which collectively bargains with the International Longshoreman's Association ("ILA") through NYSA. APM Is located at 5080 McLester Street, Elizabeth, NJ 07207.

## FACTS RELEVANT TO ALL CLAIMS

7.      A copy of the Collective Bargaining Agreement between NYSA and ILA is attached and incorporated herein as Exhibit A.

8.      Plaintiff has worked as a Checker for the past 35 years at port facilities in and around Northern New Jersey and New York City.  As a Checker, Plaintiff verifies the identity of containers being loaded and offloaded from ships making port-call, assists in the loading and offloading of ships making port-call, and carries out clerical work associated with keeping track of containers that have been loaded and offloaded from ships making port-call.

9.      During the 35 years he has worked as a Checker, Plaintiff has been a member of Local 1, and has been represented for collective bargaining purposes by Local 1.

2

10.     William Caldarrra worked for APM, as a Checker, on a daily basis from 2018 to 2023. Over the years he has never been presented with any negative critiques of his work.

11.     On November 4, 2023 Caldarera was told by the Local 1 Dispatcher to report to a job at another dock, and not APM's dock. Apparently he was not on the APM hiring list. No one spoke to him about any problems.

12.     On December 6, 2023 William Caldarera received a "No Hire" letter from APM. The letter stated that this was happening because on November 3, 2023, he allegedly was "not present with the machine [he] was assigned to." The letter further alleged that Mr. Caldarera was confronted by the dock boss about his absence and was "combative and insubordinate."

13.     This did not happen.

14.     On  November 3, 2023, the APM "dock boss" assigned Plaintiff to do office work starting at 6am. He had never worked there before. His partner was Ashley DiSiva. He signed in at 6am. He was never on the terminal floor that day. Ms. DiSilva has attested to Local 1, and to APM, about Mr. Caldarera's assignment that day. She furnished Mr. Caldarera with copies of some of the texts she sent that day from the office, and Caldarera presented them to Local 1.

15.     Petitioner filed a timely grievance protesting his placement of the No Hire List, a placement which severely limited his income.

16.     That grievance went through the contractual grievance procedure, slowly, until, on September 30, 2025, it was heard at a "Fourth Step" hearing before a joint NY Shipping Association - Local 1 "Contract Board,"  at what is called a Step 4 Hearing. It reached Step 4 because at the 3rd Step, another union-employed committee had deadlocked about whether to uphold Petitioner's grievance.

17.     The Collective Bargaining Agreement says the following about Step 4:

3

a) Deadlocked voles of the LRC or of any joint labor-management committee or trust fund shall be submitted to the NYSA-TLA Contract Board for resolution. An appeal from a determination of the LRC which was required to resolve a deadlock of the Labor Adjusters must be brought in within thirty (30) days of the date of the notice that that Committee had deadlocked.  In the absence of a deadlocked vote of the LRC, the determination of that Committee shall be final and binding. shall   constitute an enforceable arbitration award, and no further appeal shall be permitted.

(b) Decisions by the Contract Board are final and binding and shall constitute enforceable arbitration awards. No further reconsideration of a determination hy the Contract Board shall be permitted in the absence of new and substantial evidence requiring further consideration. Such new and substantial evidence must be submitted to the Board in writing at the lime of the request for reconsideration.  The Board, in its sole discretion, shall determine if a personal appearance is necessary, if it determines that new and substantial evidence has been submitted. In the event of a deadlock of the Contract Board, the matter shall be submitted to arbitration.

18.     At the Contract Board hearing Petitioner explained his assignment of November 3, 2023 – which had been to do office work – and presented the text messages he got from his partner that day. No one testified differently. The union, which had interviewed Ms. Disilva, did not present its finding to the Contract Board.

19.      On February 11, 2026 Petitioner was sent a letter from the NYSA Contract Board that it had denied his grievance (Exhibit B), and that its decision was final and binding. This meant that the Union voted with the employer to deny the grievance, even though it was aware that what Caldarera was presenting was accurate.

20.     These actions by the Union were arbitrary and capricious, and in breach of its duty of fair representation.

21.     The hearing process, where the hearing Board, in what became, under the Contract, an arbitration hearing, lacked fundamental due process; no witness testified against the grievant, and the decision stated that the Contract Board had placed the "burden" on Petitioner to

4

"carry the burden on the appeal." In fact, in New York, the burden of proof in a disciplinary arbitration is on the employer. It was further tainted by the Union's breach of its duty of fair representation.

22.     As per the Contract, the decision of the Contract Board constitutes an Arbitration Award, and is subject to review as such.

23.     None of the arbitrators were sworn, nor was the decision stated in a sworn document.

## CAUSE OF ACTION

24.     The Award was precured and issued in violation of CPLR 7511b) i, and iv.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner demands that judgment be entered against Respondents, vacating the arbitration award of December 11, 2025, and that the Court award costs and attorneys' fees.

## VERIFICATION

Arthur Z. Schwartz, an attorney at law duly admitted to the Bar of the State of New York, affirms that the aforestated is true to my knowledge information and belief. I affirm this 30th day of March, 2026, under the penalties of perjury, under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law. Because of my presence at the hearing, and based on Mr. Caldarera's records, I am fully familiar with the facts of the dispute.

5

Dated: New York, New York
   March 30, 2026

           ADVOCATES FOR JUSTICE,
           CHARTERED ATTORNEYS
           *Attorneys for Petitioner*

           By: *Arthur Z. Schwartz*
            Arthur Z. Schwartz
           225 Broadway, Suite 1902
           New York, New York 10007
           (212) 285-1400
           aschwartz@afjlaw.com

6

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF RICHMOND
-------------------------------------------------------------------------X
In the Matter of

WILLIAM CALDARERA,                                        Index No. 85061/2026

                                    Petitioner,

            -against-                                     **AMENDED
                                                         <u>**VERIFIED PETITION**</u>

NEW YORK SHIPPING ASSOCIATION and APM
TERMINALS LLC,

                                    Respondents,


Pursuant to CPLR Article 75.
-------------------------------------------------------------------------X

Plaintiff, as and for his Amended Petition against Respondents, alleges, by his attorneys,

Advocates for Justice, Chartered Attorneys, as follows:

## <u>INTRODUCTION</u>

1.      This is an action seeking to vacate a decision, framed by Respondents as an

arbitration award. This Petition is in part based on the lack of due process at the arbitration

hearing, and, in part, because of the breach of the duty of fair representation by Plaintiff's union,

the International Association of Longshoremen.

## <u>JURISDICTION AND VENUE</u>

2.      This lawsuit is brought pursuant to CPLR Article 75 et seq. Defendants New York

Shipping Association and APM Terminals LLC do business in the State of New York.

3.      Venue is based on Plaintiff's residence, which is at 52 East Scranton Avenue,

Staten Island, NY  10308.

## PARTIES

4.      Plaintiff, William Caldarera, is a resident of Richmond County, New York.  He is a member of International Longshoreman's Association, Local 1 ("Local 1"), and at all relevant times was represented by Local 1 for collective bargaining purposes. At all relevant times he was an employee of Defendant APM Terminals LLC.

5.      Defendant New York Shipping Association (hereafter "NYSA") is a Trade Association which bargains collectively for numerous waterfront terminal operators in the NY Harbor area, including APM Terminals LLC. NYSA is located at 333 Thornall Street, Suite 3A, Edison, New Jersey 08837

6.      Defendant APM Terminals LLC (hereafter "APM") is an employer which collectively bargains with the International Longshoreman's Association ("ILA") through NYSA. APM Is located at 5080 McLester Street, Elizabeth, NJ 07207.

## FACTS RELEVANT TO ALL CLAIMS

7.      A copy of the Collective Bargaining Agreement between NYSA and ILA is attached and incorporated herein as Exhibit A.

8.      Plaintiff has worked as a Checker for the past 35 years at port facilities in and around Northern New Jersey and New York City.  As a Checker, Plaintiff verifies the identity of containers being loaded and offloaded from ships making port-call, assists in the loading and offloading of ships making port-call, and carries out clerical work associated with keeping track of containers that have been loaded and offloaded from ships making port-call.

9.      During the 35 years he has worked as a Checker, Plaintiff has been a member of Local 1, and has been represented for collective bargaining purposes by Local 1.

2

10. William Caldarrra worked for APM, as a Checker, on a daily basis from 2018 to 2023. Over the years he has never been presented with any negative critiques of his work.

11. On November 4, 2023 Caldarera was told by the Local 1 Dispatcher to report to a job at another dock, and not APM's dock. Apparently he was not on the APM hiring list. No one spoke to him about any problems.

12. On December 6, 2023 William Caldarera received a "No Hire" letter from APM. The letter stated that this was happening because on November 3, 2023, he allegedly was "not present with the machine [he] was assigned to." The letter further alleged that Mr. Caldarera was confronted by the dock boss about his absence and was "combative and insubordinate."

13. This did not happen.

14. On November 3, 2023, the APM "dock boss" assigned Plaintiff to do office work starting at 6am. He had never worked there before. His partner was Ashley DiSiva. He signed in at 6am. He was never on the terminal floor that day. Ms. DiSilva has attested to Local 1, and to APM, about Mr. Caldarera's assignment that day. She furnished Mr. Caldarera with copies of some of the texts she sent that day from the office, and Caldarera presented them to Local 1.

15. Petitioner filed a timely grievance protesting his placement of the No Hire List, a placement which severely limited his income.

16. That grievance went through the contractual grievance procedure, slowly, until, on September 30, 2025, it was heard at a "Fourth Step" hearing before a joint NY Shipping Association - Local 1 "Contract Board," at what is called a Step 4 Hearing. It reached Step 4 because at the 3rd Step, another union-employed committee had deadlocked about whether to uphold Petitioner's grievance.

17. The Collective Bargaining Agreement says the following about Step 4:

3

a) Deadlocked votes of the LRC or of any joint labor-management committee or trust fund shall be submitted to the NYSA-TLA Contract Board for resolution. An appeal from a determination of the LRC which was required to resolve a deadlock of the Labor Adjusters must be brought in within thirty (30) days of the date of the notice that that Committee had deadlocked. In the absence of a deadlocked vote of the LRC, the determination of that Committee shall be final and binding. shall constitute an enforceable arbitration award, and no further appeal shall be permitted.

(b) Decisions by the Contract Board are final and binding and shall constitute enforceable arbitration awards. No further reconsideration of a determination hy the Contract Board shall be permitted in the absence of new and substantial evidence requiring further consideration. Such new and substantial evidence must be submitted to the Board in writing at the lime of the request for reconsideration. The Board, in its sole discretion, shall determine if a personal appearance is necessary, if it determines that new and substantial evidence has been submitted. In the event of a deadlock of the Contract Board, the matter shall be submitted to arbitration.

18. At the Contract Board hearing Petitioner explained his assignment of November 3, 2023 – which had been to do office work – and presented the text messages he got from his partner that day. No one testified differently. The union, which had interviewed Ms. Disilva, did not present its finding to the Contract Board.

19. On February 11, 2026 Petitioner was sent a letter from the NYSA Contract Board that it had denied his grievance (Exhibit B), and that its decision was final and binding. This meant that the Union voted with the employer to deny the grievance, even though it was aware that what Caldarera was presenting was accurate.

20. These actions by the Union were arbitrary and capricious, and in breach of its duty of fair representation.

21. The hearing process, where the hearing Board, in what became, under the Contract, an arbitration hearing, lacked fundamental due process; no witness testified against the grievant, and the decision stated that the Contract Board had placed the "burden" on Petitioner to

4

"carry the burden on the appeal." In fact, in New York, the burden of proof in a disciplinary arbitration is on the employer. It was further tainted by the Union's breach of its duty of fair representation.

22. As per the Contract, the decision of the Contract Board constitutes an Arbitration Award, and is subject to review as such.

23. None of the arbitrators were sworn, nor was the decision stated in a sworn document.

## CAUSE OF ACTION

24. The Award was precured and issued in violation of CPLR 7511b) i, and iv.

## PRAYER FOR RELIEF

WHEREFORE, Petitioner demands that judgment be entered against Respondents, vacating the arbitration award of December 11, 2025, and that the Court award costs and attorneys' fees.

## VERIFICATION

Arthur Z. Schwartz, an attorney at law duly admitted to the Bar of the State of New York, affirms that the aforestated is true to my knowledge information and belief. I affirm this 30th day of March, 2026, under the penalties of perjury, under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law. Because of my presence at the hearing, and based on Mr. Caldarera's records, I am fully familiar with the facts of the dispute.

5

Dated: New York, New York
March 30, 2026

ADVOCATES FOR JUSTICE,
CHARTERED ATTORNEYS
*Attorneys for Petitioner*

By: *Arthur Z. Schwartz*
    Arthur Z. Schwartz
225 Broadway, Suite 1902
New York, New York 10007
(212) 285-1400
aschwartz@afjlaw.com

6

# EXHIBIT A

# NYSA-ILA
## CONTRACT BOARD

**N.Y.S.A.**
333 THORNALL STREET • SUITE 3A
EDISON, NEW JERSEY 08837-2220

10 EXCHANGE PLACE – SUITE 1400
JERSEY CITY, NJ 07302

(201) 479-3590

December 11, 2025

**I.L.A.**
5000 WEST SIDE AVENUE
NORTH BERGEN, NJ 07047

**VIA EMAIL:** aschwartz@afjlaw.com
and **FIRST-CLASS MAIL**

Arthur Z. Schwartz, Esq.
225 Broadway, Suite 1902
New York, New York 10007

Re:     **Your Client: William Caldarera**
**WF# 80521**

Dear Mr. Schwartz:

At a meeting of the NYSA-ILA Labor Relations Committee (LRC) held on Tuesday, September 30, 2025, your client's appeal from the NYSA-ILA Labor Adjusters' April 2, 2024 decision, which denied his grievance against APM relating to a "Do Not Hire" letter, was heard.

After reviewing the documents before it, including the documents which you provided before the meeting, hearing your argument, and testimony from your client, and after a discussion, the Committee upheld the April 2, 2024 decision of the NYSA-ILA Labor Adjusters and denied your client's appeal because it was not clear from the evidence that was presented that your client was not on the terminal floor on November 3, 2023 when the incident occurred so your client had not carried his burden on appeal.

Please be further advised that the decision of the Committee is conclusive, final and binding.

Sincerely,

*Blanca Rivera*

Blanca Rivera
Executive Secretary

cc:     ILA Local 1
Mr. William Caldarera

# EXHIBIT B

Case 1:17-cv-01414-VEC   Document 35-1   Filed 05/10/17   Page 1 of 48

# EXHIBIT A

# COLLECTIVE BARGAINING AGREEMENT

BETWEEN

## NEW YORK SHIPPING ASSOCIATION, INC.
(FOR AND ON BEHALF OF ITS MEMBERS)

AND

## INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL-CIO
(FOR AND ON BEHALF OF ITS AFFILIATED LOCALS)

EFFECTIVE OCTOBER 1, 2004
FOR THE SIX-YEAR TERM
EXPIRING SEPTEMBER 30, 2010

FOR THE

## PORT OF NEW YORK AND NEW JERSEY

COLLECTIVE BARGAINING AGREEMENT
FOR THE PORT OF NEW YORK AND NEW JERSEY

TABLE OF CONTENTS

PREAMBLE ............................................................................1

ARTICLE I - SCOPE OF AGREEMENT ..........................................2

    Section 1.   Employers ...............................................2
    Section 2.   Master Contract .......................................2

ARTICLE II-JURISDICTION .......................................................3

    Section 1.   -Jurisdiction - Container and Ro/Ro Operations3
    Section 2.   -Jurisdiction - Breakbulk and Bulk Operations 3
    Section 3.   Union Security Clause and Checkoff ......5
    Section 4.   Shop Steward .........................................6
    Section 5.   Port of Discovery Program.....................6

ARTICLE III-WAGES ...............................................................7

    Section 1.   Basic Straight-Time Wage Rates.............7
    Section 2.   -Longshoremen's, Checkers' and Marine Carpenters' Breakbulk and Bulk Cargo Hourly Premiums .......................................................8
    Section 3.   -Maintenance Employees' Hourly Premiums   9
    Section 4.   Marine Carpenters' Hourly Premiums...11
    Section 5.   Skill and Position Differentials..............11
    Section 6.   -Productivity Standards and Skill Differentials 13
    Section 7.   Overtime Rates .....................................13
    Section 8.   Payment of Wages.................................13
    Section 9.   -Holiday Payments to Clerks, Timekeepers, and Assistants   14
    Section 10. -Chief Clerk of the Processing Department and Problem Resolution Department   15
    Section 11. Wage Scale Charts ...............................15

ARTICLE IV-HOURS ............................................................. 15

      Section 1.    Regular Work Day ................................ 15
      Section 2.    Starting Times ...................................... 16
      Section 3.    Meal Hours........................................... 17
      Section 4.    Holidays .............................................. 18

ARTICLE V--FLEXTIME FOR DELIVERY AND RECEIPT OF CONTAINERS 19

      Section 1.    Hourly Rates......................................... 19
      Section 2.    Modifications ....................................... 21

ARTICLE VI-MINIMUM GUARANTEES...................................... 21

      Section 1.    -Longshoremen Working at Other Than Passenger Ship Terminals 21
      Section 2.    -Longshoremen Working at Passenger Ship Terminals    24
      Section 3.    Maintenance Employees........................ 27
      Section 4.    Cargo Repair Workers.......................... 28
      Section 5.    Marine Carpenters ................................ 28
      Section 6.    Checkers............................................... 29
      Section 7.    Clerks and Timekeepers ....................... 30
      Section 8.    11:00 P.M. Starting Time ..................... 33
      Section 9.    Work Stoppage...................................... 33

ARTICLE VII-WORKFORCE REQUIREMENTS ............................ 33

      Section 1.    Gang Sizes............................................ 33
      Section 2.    -Relief Structure for Container
                      Operations ...................................... 36
      Section 3.    Checkers............................................... 37
      Section 4.    Maintenance Employees........................ 37
      Section 5.    Timekeeper........................................... 37
      Section 6.    Receiving and Delivery Clerk .............. 37
      Section 7.    Flexibility ............................................ 38

ARTICLE VIII-EMPLOYEE BENEFITS ....................................... 39

      Section 1.    MILA ................................................... 39
      Section 2.    -NYSA-ILA Medical and Clinical Services Fund    40
      Section 3.    NYSA-ILA Welfare Fund ..................... 40
      Section 4.    NYSA Supplemental Welfare Fund ...... 41
      Section 5.    NYSA-ILA Pension Trust Fund............ 41
      Section 6.    -NYSA-ILA Money Purchase Pension Fund and Plan    44
      Section 7.    NYSA-ILA Vacation and Holiday Fund44
      Section 8.    NYSA-ILA Container Royalty Fund..... 45
      Section 9.    NYSA-ILA GAI Fund........................... 45
      Section 10. NYSA-ILA Scholarship Fund .............. 46
      Section 11. Duplication of Coverage ...................... 46

ARTICLE IX-FUNDING OF EMPLOYEE BENEFITS...................... 46

      Section 1.    NYSA-ILA Assessment Agreement...... 46
      Section 2.    -NYSA-ILA Fringe Benefits Escrow
                      Fund .............................................. 47
      Section 3.    Funding of Pensions ............................. 48
      Section 4.    Funding of Welfare Benefits ................ 48

ARTICLE X-CONTRACT ADMINISTRATION .............................. 49

Section 1.   Contract Board .......................................49
Section 2.   NYSA-ILA Work Practices Committee 51
Section 3.   Productivity Improvement.....................52
Section 4.   Controlling Vacations...........................52

ARTICLE XI-New Employees .................................................53

ARTICLE XII-Dispatchers .....................................................55

Section 1.   Responsibilities .....................................55
Section 2.   Selection of Dispatchers........................55

ARTICLE XIII-Longshoremen's Seniority ...........................56

Section 1.   Seniority ................................................56
Section 2.   Definitions.............................................56
Section 3.   Gangs ....................................................56
Section 4.   -Permanent Vacancies in Regular
            Gangs ..................................................57
Section 5.   -Permanent Vacancies for Regular List Positions        58
Section 6.   -Piers or Terminals Reopened within Three Years after Disuse        60
Section 7.   -New Piers and Piers and Terminals Reopened More than Three Years after  Disuse        60
Section 8.   Measuring Seniority .............................61
Section 9.   Qualifications for Employment .............64
Section 10.  Removal from List or Gang Positions ...64
Section 11.  Effect of this Article .............................65

ARTICLE XIV-Checkers/Clerks' Seniority ......................65

Section 1.   Classification of Seniority ....................65
Section 2.   Seniority Groups ...................................69
Section 3.   Timekeepers ..........................................69
Section 4.   Qualifications for Employment .............70
Section 5.   -Filling Job Vacancies; Layoffs; Promotions     71
Section 6.   Continuous Service ...............................71
Section 7.   Allowable Breaks in Service ................72
Section 8.   -Transfers of Disabled Workers into Checker and Clerk Crafts        73
Section 9.   Effect of this Article .............................74

ARTICLE XV-Maintenance Seniority...............................75

Section 1.   Company Seniority................................75
Section 2.   Assignment of Employees.....................75
Section 3.   -Piers or Terminals Reopened Within Three Years after Disuse        75
Section 4.   Unqualified Employees .........................76
Section 5.   Additional Employees ...........................76
Section 6.   Limited Pass Registrants .......................76
Section 7.   Effect of this Article .............................77

ARTICLE XVI-Hiring Procedures.......................................77

Section 1.   Availability for Work ............................77
Section 2.   Hiring of Longshoremen .......................77
Section 3.   Categories for Longshoremen ...............88
Section 4.   -Hiring of Clerks, Checkers and Timekeepers   88
Section 5.   Hiring of Maintenance Employees ........93
Section 6.   Absentee Procedures .............................94

ARTICLE XVII-Training .......................................................94

Section 1.    NYSA-ILA Driver Training Program ...94
Section 2.    Mandatory Training................................95

ARTICLE XVIII-INCOME GUARANTEE.....................................95

Section 1.    Control of GAI Costs ............................95
Section 2.    Filling Vacancies...................................95
Section 3.    GAI Payments .......................................96
Section 4.    Ineligibility for GAI .............................97

ARTICLE XIX-DRUG AND ALCOHOL ABUSE PROGRAM ...........97

ARTICLE XX-SAFETY ............................................................97

Section 1.    Personal Protective Equipment..............97
Section 2.    Replacing Hatch Covers ........................97
Section 3.    Raingear ...............................................98
Section 4.    Amenities ..............................................98
Section 5.    Refrigerated Cargo ...............................98
Section 6.    Chemicals..............................................98
Section 7.    Maintenance Work in the Hold ............98
Section 8.    NYSA-ILA Joint Safety Committee......99

ARTICLE XXI-PROHIBITED CONDUCT ...................................100

Section 1.    Alcohol and Drugs ..............................100
Section 2.    Smoking ..............................................100
Section 3.    Presence on the Pier ...........................101
Section 4.    -Incompetency. Shirking of Work,
              and Theft ......................................101
Section 5.    Discipline ...........................................101

ARTICLE XXII--ANTI-HARASSMENT AND ANTI-DISCRIMINATION POLICY    102

ARTICLE XXIII-MANAGEMENT RIGHTS ...............................102

Section 1.    Management Rights.............................102
Section 2.    Change of Operation ..........................102

ARTICLE XXIV--PROHIBITION OF LOCKOUTS, STRIKES,
              AND WORK STOPPAGES ...........................................103

ARTICLE XXV-GRIEVANCE AND ARBITRATION....................103

Section 1.    Scope..................................................103
Section 2.    -THE FIRST STEP - Supervisor/Shop Steward 103
Section 3.    -THE SECOND STEP - Labor
              Adjusters ....................................104
Section 4.    THE THIRD STEP - LRC...................105
Section 5.    -THE FOURTH STEP - NYSA-ILA Contract Board    106
Section 6.    THE FIFTH STEP - Arbitration..........107
Section 7.    Powers of the Arbitrator ......................108
Section 8.    Interpretation of the Agreement ..........109
Section 9.    Customs and Practices.........................109
Section 10.   Master Contract Grievances ................109

ARTICLE XXVI-TERM OF AGREEMENT .................................109

ARTICLE XXVII-SIGNATORIES ...........................................110

Section 1.    Execution of Agreement......................110

Section 2.    Refusal to Work ..................................110
Section 3.    Complete Agreement...........................111

ARTICLE XXVIII-MISCELLANEOUS .....................................111

Section 1.    Headings..............................................111
Section 2.    Gender Neutral Language....................111
Section 3.    Severability .........................................111
Section 4.    Ratification..........................................112
Section 5.    Changes...............................................112

ANNEXES:

Annex A    Master Contract between United States Maritime Alliance, Ltd. and the International Longshoremen's Association, AFL-CIO, effective October 1, 2004, for the Six-Year Term Expiring on September 30, 2010

Annex B    Wage Scale Charts for October 1, 2004, through September 30, 2006; October 1, 2006, through September 30, 2008; October 1, 2008, through September 30, 2009; and October 1, 2009, through September 30, 2010

Annex C    NYSA-ILA Assessment Agreement dated September 24, 2004, and effective October 1, 2004, including amendments

Annex D    NYSA-ILA Contract Board Leave of Absence Procedures, effective April 1, 2005

Annex E    NYSA-ILA Contract Board Absentee Procedures, effective January 1, 2008

Annex F    NYSA-ILA Port of New York and New Jersey Plan for Implementation of the Master Contract Drug and Alcohol Abuse Program, as amended and restated in December 2007

Annex G    The NYSA-ILA Joint Safety Violations Program

Annex H    New York Shipping Association, Inc. - International Longshoremen's Association, AFL-CIO, Anti-Harassment and Anti-Discrimination Policy for the Port of New York/New Jersey, entitled "Respect and Dignity in the Maritime Industry Workplace"

# COLLECTIVE BARGAINING AGREEMENT FOR THE PORT OF NEW YORK AND NEW JERSEY

## PREAMBLE

THIS COLLECTIVE BARGAINING AGREEMENT (hereinafter this "Agreement"), made and entered into by and between the members of the NEW YORK SHIPPING ASSOCIATION, INC. (hereinafter "Association" or "NYSA"): carriers, contracting stevedores, marine terminal operators, and maintenance contractors operating in the Port of New York and New Jersey, and the INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL-CIO, and its affiliated local unions representing longshoremen, clerks, checkers, timekeepers, cargo repair workers, maintenance employees, and marine carpenters in the Port of New York and New Jersey (hereinafter "ILA" or "Union"), establishes the terms and conditions of employment for all longshore employees, including longshoremen and hatch foremen; cargo repair workers; checkers, clerks, timekeepers, and their assistants, including head receiving and delivery clerks; general maintenance, mechanical and miscellaneous workers; and marine carpenters who are engaged in the Port of New York and New Jersey in work pertaining to the rigging of ships, handling lines in connection with the docking and undocking of ships, loading and unloading and checking and tallying of cargoes, including mail, ships' stores and baggage; repairing of cargo; shoring of cargo; and maintenance and repair of

equipment and facilities used in the handling and stevedoring of cargo, including containers and chassis.

## ARTICLE I
### SCOPE OF AGREEMENT

**Section 1.    Employers**

The Employers bound to this Agreement (hereinafter "Employers") are the carriers, contracting stevedores, marine terminal operators, maintenance contractors, and other persons employing employees covered by this Agreement that are members of the NYSA, that become members of the NYSA during the term of this Agreement, that subscribe to this Agreement, or that become bound to this Agreement by operation of law.

**Section 2.    Master Contract**

The parties are bound by the terms and conditions of a collective bargaining agreement known as the Master Contract between the United States Maritime Alliance, Ltd. and the ILA establishing terms and conditions of employment for longshoremen, clerks, checkers, and maintenance employees employed in container and roll-on/roll-off ("ro/ro") operations in ports on the East and Gulf Coasts of the United States, including the Port of New York and New Jersey, for the period from October 1, 2004, through September 30, 2010. This Agreement on local conditions in the Port of New York and New Jersey is subject to the terms and conditions of the Master Contract, a copy of which is appended to this Agreement as Annex A, and shall supplement the terms and conditions of the Master Contract for container and ro/ro operations and prescribe the terms and conditions of employment for work pertaining to stevedoring and marine terminal operations involving breakbulk and bulk ships in the Port of New York and New Jersey.

## ARTICLE II
### JURISDICTION

**Section 1.    -Jurisdiction - Container and Ro/Ro Operations**

The jurisdiction of employees covered by this Agreement who are engaged in work involving container and ro/ro operations shall be determined by the provisions of the Master Contract.

**Section 2.    -Jurisdiction - Breakbulk and Bulk Operations**

**(a) No Subcontracting.** The Employers agree that they will not directly perform work done on a pier or terminal or contract out such work which historically and regularly has been and currently is performed by employees covered by this Agreement unless such work on such pier or terminal is performed by employees covered by this Agreement. It is recognized that the marine terminal work of the employees covered by this Agreement has traditionally been performed on pier and waterfront facilities. When such marine terminal work is moved off the marine terminal by an Employer to facilities in the port area, the employees covered by this Agreement shall retain their work jurisdiction at the off-pier facilities when the work at the off-pier facilities is the work that would have been performed by them in the marine terminal.

**(b) New Technology.** The new technology provisions of the Master Contract shall apply to breakbulk and bulk operations.

**(c) Timekeepers, Clerks and Checkers.** Timekeepers shall perform the work of validating employees covered by this Agreement under the Waterfront Commission Act. Clerks and checkers shall perform the work of preparing data from which truck loading billings are made, but such work must be performed in connection with their other duties. Clerks shall perform the work of preparing truck loading tickets.

**(d) Maintenance Employees.** Maintenance employees shall perform facility maintenance work at marine terminals and the work of maintaining and repairing equipment and machinery used in the handling and stevedoring of cargo, including containers and chassis. The work of plugging and unplugging reefer containers aboard vessels is ILA maintenance work and shall not be performed by other persons, such as ships' crews, in accordance with the provisions of the Master Contract.

**(e) Cargo Repair Workers.** Cargo repair workers shall perform the work of repairing and reconditioning all cargo, including strapping or restrapping, stenciling, marking or remarking, packing or repacking, and bagging or rebagging, provided such work is done by or is performed for

Employers in connection with the loading and unloading of cargo in the Port of New York and New Jersey.

**(f) Marine Carpenters.** Marine carpenters shall perform all woodwork pertaining to the fitting of ships and repairing of piers and docks and to the building and repairing of all gangways, cargo-skids, aeroplanes, pallets, and berry boxes (except cooperage and cargo repairs) and the shoring-off of automobiles and cargo.

**(g) Truck Loading.** All work at marine terminals relating to the loading of trucks, when truck loading service is provided by the Employer, shall be performed by employees covered by this Agreement.

### Section 3.     Union Security Clause and Checkoff

**(a) Union Membership.** As a condition of employment all employees covered by this Agreement shall on or after the thirtieth (30th) day following the beginning of employment or the effective date of this Agreement, whichever is later, become members of the Union and remain members during the term of this Agreement. All employees who are members of the Union on the effective date of this Agreement shall remain members during the term of this Agreement. In connection with the provisions of this Section, no Employer shall be required to discharge an employee for reasons other than those set forth in the appropriate provisions of the Labor Management Relations Act of 1947, as amended.

**(b) ILA International Checkoff.** The Employers shall deduct from the wages and other compensation of those employees who so authorize by a written assignment or signed checkoff authorization filed with the Association the total sum authorized by those employees for each hour paid for, representing the portion of the ILA International membership dues of such employees. All money so deducted shall be paid to the International Longshoremen's Association, AFL-CIO, as promptly as possible after the end of the payroll week for which the deductions are made.

**(c) Local Union Checkoff.** When a local union so requests and upon receipt of proper authorization from the individual member, the Employers shall deduct from the wages of those employees who so authorize by a written assignment or signed checkoff authorization filed with the Association the total sum authorized by those employees for each hour paid for, representing the portion of the local union membership dues of such employees. All money so deducted shall be paid to the local unions involved.

### Section 4.     Shop Steward

Each Employer recognizes the right of employees in the longshoremen, checkers, and maintenance crafts employed at the Employer's premises to select an employee of their own choosing without interference from the Employer to act as their representative and spokesperson under the Grievance Procedure of this Agreement in presenting their grievances to the Employer and in attempting to resolve them satisfactorily. Such representative is to be known as the shop steward. When the presentation of such a grievance is urgent, a reasonable time spent in presenting the grievance to the Employer on the premises shall be allowed such designated employee without loss of pay. The shop steward shall perform the work or services assigned to him by the Employer, shall not receive any preferential or privileged treatment, and in all respects shall be subject to all of the terms and conditions of this Agreement, except that the shop steward shall not be required by any Employer to be a member of a gang.

### Section 5.     Port of Discovery Program

In accordance with the August 10, 2000, determination of the Jurisdiction Committee established under the Master Contract that it shall be the responsibility of each port to establish a procedure that will verify that all parties are complying with the provisions of the Master Contract relating to the repair of containers and chassis having major damage, the NYSA and Local 1804-1, International Longshoremen's Association, AFL-CIO, have agreed upon a Port of Discovery Program for the Port of New York and New Jersey.

**ARTICLE III**
**WAGES**

### Section 1.     Basic Straight-Time Wage Rates

In the Port of New York and New Jersey the basic straight-time wage rates are the same for all crafts for all cargo operations, including containerized, ro/ro, breakbulk, and bulk. The basic straight-time hourly wage rates in effect on September 30, 2004, which are based upon the date of entry into the industry, were as follows:

| Hourly Rate | Date of Entry into Industry |
| --- | --- |
| $27.00 | Prior to 12/01/1990 |
| $21.00 | From 12/01/1990 to 09/30/1996 |
| $17.00 | From 10/01/1996 to 09/30/2001 |
| $16.00 | -From 10/01/2001 to 09/30/2004 (For longshoremen, clerks, and checkers) |
| $15.00 | -From 10/01/2001 to 09/30/2004 -(For employees other than longshoremen, clerks, and checkers) |

The above basic straight-time wage rates shall be increased in accordance with the provisions of Article II of the Master Contract. The wage rate for new employees who enter the industry on or after October 1, 2004, shall be in accordance with the provisions of Article II of the Master Contract.

**Section 2.      -Longshoremen's, Checkers' and Marine Carpenters' Breakbulk and Bulk Cargo Hourly Premiums**

The following hourly premiums shall be added to the basic straight-time wage rate for longshoremen, checkers, and marine carpenters, when handling the following breakbulk or bulk cargoes:

When handling explosives, including containerized explosives, and when handling cargo, including container cargo, that is damaged by fire or water causing distress or obnoxious conditions (salvage cargo), longshoremen, checkers, and marine carpenters shall be paid at double the basic straight-time wage rate.

**Section 3.      -Maintenance Employees' Hourly Premiums**

**(a) "Dirty Money" Work.**  All work performed by maintenance employees other than sweepers and handymen or shoregangs in any tanks or bilges that have not been previously cleaned shall be considered "dirty money" work and shall be paid for at the overtime rate of one and one-half times the basic straight-time wage rate being paid to that maintenance employee but only for the actual number of hours during which such work is performed. The handling of chlorine gas shall be considered "dirty money" work and shall be paid for at the overtime rate of one and one-half times the basic straight-time wage rate but only for the actual number of hours during which such work is being performed.

**(b) Hourly Premiums.**  The following hourly premiums shall be added to the basic straight-time wage rate being paid to maintenance employees:
When handling explosives, including containerizied explosives, maintenance employees shall be paid at double the base straight-time rate.

**(c)  Tool Allowance.** A tool allowance of 5 cents ($0.05) per hour shall be paid to maintenance employees who are required to furnish and use their own tools and maintain them in good condition. This tool allowance is not considered to be wages or compensation for services performed but is intended merely as reimbursement on a uniformly reasonable basis of expenses incurred by such an employee in furnishing the employee's own tools.

**Section 4.      Marine Carpenters' Hourly Premiums**

**(a)  Hourly Premiums.** Marine Carpenters, including snappers and temporary foremen, shall receive an hourly premium of thirty cents ($0.30), which shall be added to the basic straight-time

wage rate, when they use portable saws except in a shop.          **(b) Tool Allowance.** A tool allowance of ten cents ($0.10) per hour shall be paid to marine carpenters and snappers who are required to furnish and use their own tools and maintain them in good condition. This tool allowance is not considered to be wages or compensation for services performed but is intended merely as reimbursement on a uniformly reasonable basis of expenses incurred by such an employee in furnishing the employee's own tools.

**Section 5.      Skill and Position Differentials**

The following hourly differentials shall be added to the basic straight-time wage rate for employees in the following classifications:

| Position | Hourly Differential |
|---|---|
| **Longshoremen:** | |
| Container Crane Operator | $2.50 |
| Yard Carrier | $2.00 |
| Straddle Operator | $2.00 |
| Hustler Operator | $1.50 |
| Toploader Operator | $1.50 |
| Stack Operator (25 tons or more) | $1.50 |
| Transtainer/RTG Operator | $1.50 |
| Commercial Driver License | $1.50 |

| Position | Hourly Differential |
|---|---|
| Payload Operator | $0.50 |
| Bulldozer Operator | $0.50 |
| Hatch Foreman | $0.50 |
| **Clerks and Checkers:** | |
| Head Clerk | $0.50 |
| Assistant Clerk, Temporary Clerk and Assistant Timekeeper | |
| From 10/01/04 to 09/30/06 | $1.00 |
| From 10/01/06 to 09/30/10 | $1.50 |
| Dock Boss (Regular and Temporary) | $0.50 |
| Head Timekeeper | $0.50 |
| **Maintenance Employees:** | |
| Container/Chassis Mechanic | $2.50 |
| Roadability Mechanic | $2.50 |
| Crane Mechanic | $2.50 |
| Power Mechanic | $2.50 |
| Reefer Mechanic | $2.50 |
| Facility Maintenance Mechanic | $2.50 |
| Mechanic/Electrician | $2.50 |
| Mechanic /Electrician Foreman | $1.00 |
| TIR Inspector | $1.00 |
| Yardman (not including Sweeper) | $2.00 |
| **Other Crafts:** | |
| Cargo Repair Foreman | $0.25 |
| Marine Carpenter | $0.10 |
| Marine Carpenter Foreman | $1.11 |
| Carpenter Lasher | $0.10 |
| Carpenter Snapper | $0.61 |
| **Miscellaneous:** | |
| Trainer | $2.00 |

**Section 6.      -Productivity Standards and Skill Differentials**

Productivity standards for all skilled employees are to be established jointly by the Employers, the NYSA, and the ILA. Employees shall be entitled to the skill differentials set forth in this Agreement provided they are able to meet the production and performance standards determined by the Employers, the NYSA, and the ILA. The skill differentials for Temporary Clerks and Trailer Interchange Receipt ("TIR") Inspectors shall be paid, provided those employees are qualified to use and in fact use computers, including handheld computers, in the course of their job functions.

### Section 7. Overtime Rates

The basic straight-time wage rate shall be paid for any work performed from 8:00 A.M. to 12:00 noon and from 1:00 P.M. to 5:00 P.M., Monday to Friday, inclusive. Except as otherwise provided in this Agreement, as, for example, for Flextime shifts as provided in Article V of this Agreement, all other times, except meal hours, shall be considered overtime and shall be paid for at the overtime rate of one and one-half times the basic straight-time wage rate. On Saturdays, Sundays, and paid holidays, the rate of pay shall be one and one-half times the basic straight-time wage rate. If any of the days that are paid holidays fall on a Sunday and are observed on the next day, work on that Monday shall be paid for at the overtime rate of one and one-half times the basic straight-time wage rate.

### Section 8. Payment of Wages

Every effort shall be made to arrange for the payment of wages at a locality and at a time as convenient as possible to the employees. For the purpose of uniformity, the payroll period shall be from 0001 hours Monday to 2400 hours Sunday with the wages earned during the period to be paid on the Thursday immediately following the period. All wage payments shall be made by check or direct deposit. If payments are made by check, provision of facilities for cashing such checks shall be arranged.

### Section 9. -Holiday Payments to Clerks, Timekeepers, and Assistants

Clerks, timekeepers and assistants paid on a weekly basis:

**(a)** Who work on a paid holiday falling within the regular work week, Monday to Friday, inclusive, shall receive four days' pay of their regular weekly wage from their direct Employer, one day's pay at the overtime rate of one and one-half times the basic straight-time wage rate (but in no event less than a full regular day's pay if the employee works four or fewer hours) from their direct Employer, and one day's holiday pay at the basic straight-time wage rate from the NYSA-ILA Vacation and Holiday Fund;

**(b)** Who do not work on a paid holiday falling within the work week shall receive four days' pay of their regular weekly wage from their direct Employer and one day's holiday pay at the basic straight-time wage rate from the NYSA-ILA Vacation and Holiday Fund;

**(c)** Who work on a paid holiday falling on a Saturday or Sunday and not observed on Friday or Monday shall receive one day's holiday pay at the basic straight-time wage rate from the NYSA-ILA Vacation and Holiday Fund in addition to one day's pay at the overtime rate of one and one-half times the basic straight-time wage rate (but in no event less than a full regular day's pay if the employee works four or fewer hours) from their direct Employer; and

**(d)** Who do not work on a paid holiday falling on a Saturday or Sunday and not observed on Friday or Monday shall receive one day's holiday pay at the basic straight-time wage rate from the NYSA-ILA Vacation and Holiday Fund in addition to their regular weekly wage.

### Section 10. -Chief Clerk of the Processing Department and Problem Resolution Department

The NYSA, the ILA, and the direct Employers agree that each direct Employer will meet with the ILA for the purpose of discussing and agreeing upon uniform, minimum compensation for the Chief Clerk of the Processing Department and Problem Resolution Department at each marine terminal.

### Section 11. Wage Scale Charts

Wage Scale Charts setting forth the wage rates for each craft, including hourly premiums and differentials, for each contract year during the term of this Agreement are appended to this Agreement as Annex B.

**ARTICLE IV**

## HOURS

**Section 1.    Regular Work Day**

The regular work day shall consist of eight (8) hours from 8:00 A.M. to 12:00 noon and from 1:00 P.M. to 5:00 P.M., and the regular work week shall consist of forty (40) hours made up of five (5) regular work days from Monday to Friday, inclusive. When required, employees shall work any night of the week and on Saturdays, Sundays, and paid holidays. During the regular work day, when longshoremen are knocked off work at any time five minutes after the hour to less than thirty-five minutes after the hour, they shall be paid for one-half hour; and when knocked off work thirty-five minutes after the hour or later, they shall be paid for one hour. Maintenance employees may be employed either on a weekly or a daily basis. Classifications of maintenance employees (other than sweepers and handymen or shoregangs) employed on a weekly basis may be worked on a shift system, forty (40) hours to constitute a week's work with overtime to be paid for any time worked in excess of eight (8) consecutive hours or more than eight (8) hours in any one day. Work performed by such maintenance employees during any overtime hours shall be paid for at the overtime rate of one and one-half times the basic straight-time wage rate.

**Section 2.    Starting Times**

**(a) Longshoremen.** With respect to a ship or barge operation, the minimum hourly guarantees begin at the time the employee begins work. The starting times on ships (applicable seven (7) days a week) are 7:00 A.M., 8:00 A.M., 10:00 A.M., 1:00 P.M., 3:00 P.M., 7:00 P.M., and 11:00 P.M. (except on Saturdays). During the term of this Agreement additional starting times may be agreed upon by the parties.

**(b) Checkers, Clerks, and Timekeepers.** The starting time is 8:00 A.M. with the exception of hatch checkers who may also have a 1:00 P.M. starting time. On Saturdays, Sundays, and paid holidays, the starting times for vessel operations are 7:00 A.M., 8:00 A.M., 10:00 A.M., 1:00 P.M., 3:00 P.M., 7:00 P.M., and 11:00 P.M. (except on Saturdays).

**(c) Gate Operations**. Direct Employers may establish a 3:00 P.M. starting time for Gate Operations for all crafts. Employees covered by this Agreement who are ordered for this 3:00 P.M. starting time shall be paid at the basic straight-time wage rate for work performed between the hours of 3:00 P.M. and 5:00 P.M. and at one and one-half times the basic straight-time wage rate for work performed between the hours of 5:00 P.M. and 12:00 midnight. Work performed during the meal hour, which shall be determined by the direct Employer, shall be paid at double the basic straight-time wage rate. A direct Employer may not institute a 3:00 P.M. starting time for Gate Operations unless agreement on the terms and conditions relating to that Employer's facility has been reached between the Employer and all affected ILA local unions.

**(d) Maintenance Employees**. The start time for maintenance employees shall be one hour before the start time for longshoremen, when required. During the term of this Agreement additional starting times for maintenance employees may be agreed upon by the parties.

**(e) Pick-up and Return of Equipment**. When an employee is required to report to a garage, shop, or pier prior to the start of work to fuel, adjust, or transport a machine, such employee shall be paid for such additional work at the wage rate prevailing at the time such work is performed. When required to return a machine to a garage, shop, or pier, such employee shall likewise be paid for such additional work at the wage rate prevailing at the time such work is performed.

**Section 3.    Meal Hours**

Except as otherwise provided in this Agreement, as for example for Flextime shifts as provided in Article V of this Agreement, meal hours shall be from 6:00 A.M. to 7:00 A.M., from 12:00 noon to 1:00 P.M., from 6:00 P.M. to 7:00 P.M., and from 12 midnight to 1:00 A.M. For all crafts except checkers and cargo repair workers, the mid-day hour may be anytime between 11:00 A.M. and 2:00 P.M. as designated by the Employer. For all crafts other than clerks, no work shall be performed during meal hours except by mutual agreement between the employees and their direct Employer. If the hatch foreman agrees that the gang shall work the meal hour, all members of the gang must work that meal hour. All employees covered by this Agreement other than longshoremen employed at passenger ship terminals who work through the mid-day meal hour shall be at double the basic straight-time wage rate for the mid-day meal hour and then revert to the basic straight-time wage rate for hours worked subsequent to the mid-day meal hour until 5:00 P.M. Longshoremen employed at

passenger ship terminals shall be paid for the mid-day meal hour at the overtime rate of one and one-half times the basic straight-time wage rate, the overtime rate to continue until relieved. All employees covered by this Agreement shall be paid at double the basic straight-time wage rate for all other meal hours except as otherwise provided in this Agreement. The full meal hour shall be paid for at the meal-hour rate if any part of the meal hour is worked.

**Section 4.      Holidays**

Paid holidays under this Agreement shall be Columbus Day, Election Day, Veterans' Day, Thanksgiving Day, Christmas Eve, Christmas Day, New Year's Eve, New Year's Day, Dr. Martin Luther King Jr.'s Birthday, Lincoln's Birthday, Washington's Birthday, Teddy Gleason's Birthday (celebrated on March 17), Good Friday, Memorial Day, Independence Day (July 4), and Labor Day. The only non-working holidays shall be Thanksgiving Day, Christmas Day, New Year's Day, Independence Day, and Labor Day. Easter Sunday, while not a holiday, is also not a required working day. Employees ordered to passenger ship terminals, however, shall be required to work on non-working holidays and on Easter.

## ARTICLE V
### FLEXTIME FOR DELIVERY AND
### RECEIPT OF CONTAINERS

**Section 1.      Hourly Rates**

The following provisions shall constitute the Port of New York and New Jersey Flextime Agreement for all crafts as it relates to the receipt and delivery of containers:

**(a)** Employees hired at 6:00 A.M. will be paid in the following manner:

**(i)** From 6:00 A.M. to 8:00 A.M. at one and one-quarter times the basic straight-time wage rate;

**(ii)** From 8:00 A.M. to 3:00 P.M. at the basic straight-time wage rate with a meal hour to be taken between 11:00 A.M. and 12:00 noon; and

**(iii)** After 3:00 P.M. at one and one-half times the basic straight-time wage rate.

**(b)** Employees hired at 9:00 A.M. will be paid in the following manner:

**(i)** From 9:00 A.M. to 5:00 P.M. at the basic straight-time wage rate with a meal hour to be taken between 1:00 P.M. and 2:00 P.M.;

**(ii)** From 5:00 P.M. to 6:00 P.M. at one and one-quarter times the basic straight-time wage rate; and

**(iii)** After 6:00 P.M. at one and one-half times the basic straight-time wage rate.

**(c)** Employees hired at 1:00 P.M. will be paid in the following manner:

**(i)** From 1:00 P.M. to 5:00 P.M. at the basic straight-time wage rate;

**(ii)** From 5:00 P.M. to 10:00 P.M. at one and one-quarter times the basic straight-time wage rate with a meal hour to be taken between 5:00 P.M. and 6:00 P.M.; and

**(iii)** After 10:00 P.M. at one and one-half times the basic straight-time wage rate.

**(d)** The manning required between 6:00 A.M. and 8:00 A.M. and during meal hours for the purpose of receiving and delivering containers shall be only those individuals required for the operation.

**(e)** Where work associated with the receiving and delivery of containers and chassis is being performed after 5:00 P.M., there shall be one staff individual employed per craft and no minimum staffing required.

**(f)** When the receipt and delivery of containers and chassis and work associated with those functions is being performed on a Saturday, Sunday, or paid holiday, there shall be two staff individuals employed per craft with no minimum staffing required.

**(g)** During the term of this Agreement additional Flextime starting times may be agreed upon by the parties.

**(h)** The 7:00 A.M. and 8:00 A.M. starts are not considered Flextime hours.

**(i)** If any employee working a Flextime shift is required to work through the assigned meal hour, the employee shall be paid at the double time rate for the meal hour.

**(j)** Any employee working a Flextime shift on Saturdays, Sundays, and paid holidays shall be paid at the overtime rate of one and one-half times the basic straight-time wage rate.

**Section 2.       Modifications**
The NYSA and the ILA recognize that the Flextime system was implemented in order to permit the receiving and delivery of cargo outside normal hours of operation without requiring normal and customary staffing. The parties further recognize that as volumes increase, the Flextime staffing requirements may become inadequate. Accordingly, the parties agree that in the event the existing Flextime staffing levels at any marine terminal are inadequate due to increases in volume, the parties will in good faith discuss modifying the staffing levels during operations at that terminal.

**ARTICLE VI**
**MINIMUM GUARANTEES**

**Section 1.       -Longshoremen Working at Other Than Passenger Ship Terminals**
Longshoremen employed at marine terminals other than passenger ship terminals shall receive the following minimum guarantees:

**(a)** Employees employed from Monday to Sunday inclusive shall receive four (4) hours' pay for the period between 8:00 A.M. and 12:00 noon, regardless of any condition.

**(b)** Employees re-employed at 1:00 P.M. from Monday to Sunday inclusive shall receive four (4) hours' pay, except upon the finishing of a hatch or the finishing of a ship, when they shall receive a minimum of two (2) hours' pay.

**(c)** Employees hired for 1:00 P.M. from Monday to Sunday inclusive who have not worked in the morning shall receive four (4) hours' pay regardless of any condition.

**(d)** Employees re-employed at 7:00 P.M. from Monday to Sunday inclusive who have worked during the day shall receive four (4) hours' pay, except upon the finishing of a hatch or the finishing of a ship, when they shall receive a minimum of two (2) hours' pay.

**(e)** Employees re-employed at 1:00 A.M. from Monday to Sunday inclusive shall receive a minimum of four (4) hours' pay, except upon the finishing of a hatch or the finishing of a ship, when they shall receive a minimum of two (2) hours' pay.

**(f)** Employees ordered to report for work at 7:00 P.M. from Monday to Sunday inclusive who have not worked during the day shall receive a minimum of four (4) hours' pay, regardless of any condition.

**(g)** If employees have worked all night (Monday to Sunday inclusive) and are asked to work after 6:00 A.M., they shall receive the prevailing overtime rate for the hours actually worked until they finish, regardless of relief for the breakfast hour.

**(h)** When employees are ordered out and report for work at 7:00 A.M., they shall be paid:
　　**(i)** From Monday to Friday inclusive one (1) hour at the overtime rate from 7:00 A.M. to 8:00 A.M. and, thereafter, in accordance with the other minimum guarantee provisions of Article VI, Section 1 of this Agreement.
　　**(ii)** On Saturdays, Sundays, and paid holidays, one (1) hour at the overtime rate of one and one-half times the basic straight-time wage rate from 7:00 A.M. to 8:00 A.M. and, thereafter, in accordance with the other minimum guarantee provisions of Article VI, Section 1 of this Agreement.

**(i)** When employees are needed to dock and undock ships outside the regular working hours, they shall perform such work as their Employer directs during the minimum hours referred to hereunder and shall be paid at the overtime rate of one and one-half times the basic straight-time wage rate:
　　**(i)** With a minimum of four (4) hours' pay, if ordered out at any time between 7:00 P.M. and 12:00 midnight, such pay to start at 7:00 P.M. and to continue until relieved; or
　　**(ii)** With a minimum of six (6) hours' pay, if ordered out at any time between 12:00 midnight and 6:00 A.M., such pay to start at 12:00 midnight and to continue until relieved; or
　　**(iii)** With a minimum of four (4) hours' pay, if ordered out at 6:00 A.M., such pay to continue until relieved.

**(j)** Longshoremen assigned to work the vessel at the 10:00 A.M. and 3:00 P.M. starting times shall receive an eight (8) hour guarantee.

**(k)** In no event shall any employee receive the minimum guarantees set forth in Article VI, Section 1 of this Agreement, if the employee does not report for work at the hour ordered out.

**Section 2.    -Longshoremen Working at Passenger Ship Terminals**

On the arrival or departure of a passenger ship on any day of the week from Monday to Sunday inclusive, employees employed between 8:00 A.M. and 5:00 P.M. for handling passengers' baggage exclusively shall receive a minimum of four (4) consecutive hours' pay to commence at the hour set forth below. In no event shall any employee receive the minimum guarantees set forth in this Section 2 of Article VI of this Agreement, if the employee does not report for work at the hour ordered out. This provision shall not apply to employees who have been employed on the premises part of the time in other capacities and part of the time handling passengers' baggage. This provision relating to employees employed for handling passengers' baggage exclusively shall be applied as follows:

**(a) Monday to Friday Inclusive:**

**(i)** Employees hired at 8:00 A.M. shall each receive four (4) hours at the basic straight-time wage rate.

**(ii)** Employees ordered out at 9:00 A.M. shall each receive four (4) hours at the straight-time wage rate from 8:00 A.M. and one (1) hour at the overtime rate of one and one-half times the basic straight-time wage rate, the overtime rate to continue until relieved.

**(iii)** Employees ordered out at 10:00 A.M. shall each receive two (2) hours at the basic straight-time wage rate and two (2) hours at the overtime rate of one and one-half times the basic straight-time wage rate, the overtime rate to continue until relieved.

**(iv)** Employees ordered out at 11:00 A.M. shall each receive two (2) hours at the basic straight-time wage rate from 10:00 A.M. and two (2) hours at the overtime rate of one and one-half times the basic straight-time wage rate, the overtime rate to continue until relieved.

**(v)** Employees ordered out at 12:00 noon shall each receive two (2) hours at the basic straight-time wage rate from 10:00 A.M. and two (2) hours at the overtime rate of one and one-half times the basic straight-time wage rate, the overtime rate to continue until relieved.

**(vi)** Employees hired at 1:00 P.M. shall each receive four (4) hours at the basic straight-time wage rate.

**(vii)** Employees ordered out at 2:00 P.M. shall each receive four (4) hours at the basic straight-time wage rate from 1:00 P.M. and one (1) hour at the overtime rate of one and one-half times the basic straight-time wage rate.

**(viii)** Employees ordered out at 3:00 P.M. shall each receive two (2) hours at the basic straight-time wage rate, one (1) hour at the overtime rate of one and one-half times the basic straight-time wage rate, and one (1) hour at the meal hour rate, the overtime rate of one and one-half times the basic straight-time wage rate to continue until relieved.

**(ix)** Employees ordered out at 4:00 P.M. shall each receive two (2) hours at the basic straight-time wage rate from 3:00 P.M., one (1) hour at the overtime rate of one and one-half times the basic straight-time wage rate, and one (1) hour at the meal hour rate, the overtime rate of one and one-half times the basic straight-time wage rate to continue until relieved.

**(x)** Employees ordered out at 5:00 P.M. shall each receive two (2) hours at the basic straight-time wage rate from 3:00 P.M., one (1) hour at the overtime rate of one and one-half times the basic straight-time wage rate and one (1) hour at the meal hour rate, the overtime rate of one and one-half times the basic straight-time wage rate to continue until relieved.

**(xi)** Employees ordered out at 6:00 P.M. shall each receive two (2) hours at the basic straight-time wage rate from 3:00 P.M., one (1) hour at the overtime rate of one and one-half times the basic straight-time wage rate, and one (1) hour at the meal hour rate, the overtime rate of one and one-half times the basic straight-time wage rate to continue until relieved.

**(xii)** Employees hired at 7:00 P.M. shall each receive four (4) hours at the overtime rate of one and one-half times the basic straight-time wage rate.

**(b) Saturdays, Sundays and Paid Holidays:**

**(i)** Employees hired on Saturdays, Sundays, or paid holidays shall each receive a minimum of four (4) hours at the overtime rate of one and one-half times the basic straight-time wage rate, except when one of said hours is a meal hour, when they shall receive three (3) hours at the overtime rate of one and one-half times the basic straight-time wage rate and one (1) hour at the meal hour rate.

**(ii)** Employees ordered out at 5:00 P.M. or 6:00 P.M. shall each receive a minimum of four (4) hours from 3:00 P.M., three (3) hours at the overtime rate of one and one-half times the basic straight-time wage rate, and one (1) hour at the meal hour rate.

## Section 3. Maintenance Employees

Maintenance employees shall receive the following minimum guarantees:

**(a)** When maintenance employees are needed for work outside the regular or normal work hours, they shall be paid at the appropriate overtime rate of one and one-half times the basic straight-time wage rate:

**(i)** With a minimum of four hours' pay if ordered out at any time between 7:00 P.M. and 12:00 midnight, such pay to start at 7:00 P.M. and to continue until relieved (except as specified in subsection (c) below), or

**(ii)** With a minimum of six hours' pay if ordered out at any time between 12:00 midnight and 6:00 A.M., such pay to start at 12:00 midnight and to continue until relieved, or

**(iii)** With a minimum of four hours' pay if ordered out at 6:00 A.M., such overtime pay to continue until relieved.

**(b)** When employees who have been employed on the premises in the afternoon are re-employed at 7:00 P.M., they shall receive a minimum of four hours' pay, except on arrival or departure of a ship, for work connected with such arrival or departure, when they shall receive a minimum of two hours' pay. **(c)** Any maintenance employee employed on a weekly basis who is ordered out to work on a Saturday, Sunday, or paid holiday shall receive a minimum of four hours' pay.

## Section 4. Cargo Repair Workers

Cargo repair workers shall be employed and paid on the half-day (four hours) basis for any period of employment from 8:00 A.M. to 12:00 noon, from 1:00 P.M. to 5:00 P.M., from 7:00 P.M. to 11:00 P.M., or from 1:00 A.M. to 5:00 A.M., on any day of the week (including Saturdays, Sundays, and paid holidays) at the prevailing rate, whether work begins or not.

## Section 5. Marine Carpenters

Marine carpenters shall receive the following guarantees:

**(a)** Employees employed from Monday to Sunday inclusive shall receive four hours' pay for the period between 8:00 A.M. and 12:00 noon, regardless of any condition.

**(b)** Employees re-employed at 1:00 P.M. from Monday to Sunday inclusive shall receive four hours' pay, except upon the finishing of a ship, when they shall receive a minimum of two hours' pay.

**(c)** Employees hired at 1:00 P.M. from Monday to Sunday inclusive who have not worked in the morning shall receive four hours' pay regardless of any condition.

**(d)** All hours worked in excess of the minimum guarantees shall be calculated on the basis of the actual time worked, except that every fraction of an hour shall then be considered as one hour.

**(e)** Employees re-employed at 7:00 P.M. from Monday to Sunday inclusive who have worked during the day shall receive four hours' pay, except upon the finishing of a ship, when they shall receive a minimum of two hours' pay.

**(f)** Employees re-employed at 1:00 A.M. from Monday to Sunday inclusive shall receive a minimum of four hours' pay, except upon the finishing of a ship, when they shall receive a minimum of two hours' pay.

**(g)** If employees have worked all night from Monday to Sunday inclusive and are asked to work after 6:00 A.M., they shall receive the overtime prevailing rate for the hours actually worked until they finish regardless of relief for the breakfast hour.

**(h)** Employees ordered to report for work between the hours of 1:00 A.M. and 6:00 A.M. shall be paid from 1:00 A.M.

## Section 6. Checkers

Checkers shall receive the following minimum guarantees:

**(a)** When checkers who have been employed during the day are ordered back for 7:00 P.M., they shall receive a minimum of four hours' pay. When checkers who are ordered back to work until 11:00 P.M. or 12:00 midnight and are again ordered back for 1:00 A.M., they shall receive a minimum of four hours' pay between 1:00 A.M. and 5:00 A.M.

**(b)** When checkers who have been employed during the day are ordered back for 7:00 P.M. for service in connection with the loading or discharging of cargo, they shall receive a minimum of four

hours' pay except that if the longshoremen voluntarily knock off at 10:00 P.M. the checkers shall receive only three hours' pay.

(c) Checkers who have been employed during the day and are ordered back for 7:00 P.M. shall not be knocked off between the hours of 5:00 P.M. and 6:00 P.M.

(d) When fresh checkers are ordered out for work at 7:00 P.M, they shall receive a minimum guarantee of a day's pay at the basic straight-time wage rate for any work performed between 7:00 P.M. and 11:00 P.M. However, when such checkers are re-employed at 1:00 A.M., they shall receive a minimum of four hours' pay for work performed between 1:00 A.M. and 5:00 A.M. and their rate of pay from 7:00 P.M. to 12:00 midnight and from 1:00 A.M. to 5:00 A.M. shall be at the overtime rate of one and one-half times the basic straight-time wage rate.

(e) If a checker knocks off five minutes after the hour or later, the checker shall be paid for the full hour.

(f) All checkers who work through the 6:00 P.M. to 7:00 P.M. meal hour and continue to work after 7:00 P.M. shall receive pay at the overtime wage rate of one and one-half times the basic straight-time wage rate for the number of hours worked plus one additional hour; if knocked off at 7:00 P.M., they shall be paid at an overtime wage rate of double the basic straight-time wage rate for the meal hour worked.

### Section 7. Clerks and Timekeepers

Clerks and timekeepers shall receive the following minimum guarantees:

(a) All head receiving clerks, head delivery clerks, and head timekeepers, and all assistant receiving clerks, assistant delivery clerks, and assistant timekeepers who are employed on a weekly basis are to be employed for the full forty (40) hours of the regular working week.

(b) All clerks, timekeepers, and assistants who, on the effective date of this Agreement, are employed on a weekly basis shall continue to be employed in their respective capacities and shall be protected to the extent of their rates of pay prevailing on the effective date of this Agreement if such rates are higher than the rates of pay provided for under this Agreement and to the extent of payment in full for sick leave if heretofore allowed by their respective Employers.

(c) Work on Saturdays, Sundays, paid holidays, and at night by all head receiving clerks, head delivery clerks, and head timekeepers and all assistant receiving clerks, assistant delivery clerks, and assistant timekeepers who are employed on a weekly basis shall be considered overtime and shall be paid for at the applicable overtime wage rate.

(d) Clerks, timekeepers, and their assistants who work through the day and are ordered back for 7:00 P.M. for service in connection with the loading or discharging of cargo shall receive a minimum of four hours' pay *except* that if the longshoremen voluntarily knock off at 10:00 P.M., said clerks, timekeepers, and their assistants shall receive only three hours' pay.

(e) All clerks, timekeepers, and their assistants who work through the 6:00 P.M. to 7:00 P.M. meal hour and continue to work after 7:00 P.M. shall receive pay at the overtime wage rate of one and one-half times the basic straight-time wage rate for the number of hours worked plus one additional hour; if knocked off at 7:00 P.M., they shall be paid at an overtime wage rate of double the basic straight-time wage rate for the meal hour worked.

(f) All clerks, timekeepers, and their assistants who work through the 12:00 midnight to 1:00 A.M. meal hour and continue to work after 1:00 A.M. shall receive pay at the overtime wage rate of double the basic straight-time wage rate for the meal hour worked and at the overtime wage rate of one and one-half times the basic straight-time wage rate for the minimum number of hours guaranteed for the period commencing 1:00 A.M. If knocked off at 1:00 A.M., they shall be paid at an overtime wage rate of double the basic straight-time wage rate for the meal hour worked.

(g) If a clerk knocks off five minutes after the hour or later, the clerk shall be paid for the full hour.

(h) Clerks and checkers called into work temporarily as assistants to receiving clerks, delivery clerks, or timekeepers shall be paid the following minimum guarantees:

(i) If such temporary assistants are called in as fresh clerks to work at night, they shall receive a minimum of one-day's pay at the basic straight-time wage rate if ordered for work between the hours of 7:00 P.M. and 11:00 P.M. All such temporary assistants must be ordered out by 7:00 P.M. If they begin work at 7:00 P.M. and are ordered back for work

between 1:00 A.M. and 5:00 A.M., they shall work such additional hours at the overtime rate of one and one-half times the basic straight-time wage rate.

**(ii)** If such temporary assistants work through the day and are ordered back to work at night, they shall be paid on the same basis as checkers are now paid but at the wage rate applicable to temporary assistants.

**(iii)** Temporary assistants who have worked during the day and are ordered back for 7:00 P.M. shall not be knocked off between the hours of 5:00 P.M. and 6:00 P.M.

**(iv)** Temporary assistants who have worked during the day and are ordered back for 7:00 P.M. shall receive a minimum of four hours' pay from 7:00 P.M. at the overtime wage rate of one and one-half times the basic straight-time wage rate.

### Section 8.     11:00 P.M. Starting Time

All crafts ordered in at the 11:00 P.M. starting time shall be guaranteed seven (7) hours' pay as follows:

**(i)** Five (5) hours at one and one-half times the basic straight-time wage rate and (2) hours at double the basic straight-time wage rate;

**(ii)** When an Employer elects to work between 6:00 A.M., and 7:00 A.M., double the basic straight-time wage rate shall be paid for that hour;

**(iii)** The Employer shall have the right to replace all employees either at 7:00 A.M. or 8:00 A.M.;

**(iv)** The existing Sunday cancellation clause shall apply;

**(v)** Checkers who have been employed during the day and are ordered back for an 11:00 P.M. starting time are not entitled to be paid for the delay hour between 5:00 A.M. and 6:00 P.M.

### Section 9.     Work Stoppage

In the event any individual or group of individuals affiliated with the ILA or with any local or district of the ILA causes a work stoppage, employees working under this Agreement who are prevented from performing work as a result of the work stoppage shall be paid only for the actual time they work and shall not receive pay for the minimum periods guaranteed in this Article VI.

**ARTICLE VII**
**WORKFORCE REQUIREMENTS**

### Section 1.     Gang Sizes

The following minimum gang sizes shall be in effect during the term of this Agreement:

**(a) Container and Ro/Ro Gangs.** A container gang shall consist of ten (10) longshoremen, consisting of one (1) hatch foreman, three (3) crane operators, and six (6) hold/dock employees. A ro/ro gang shall also consist of ten (10) longshoremen. Additional manning for a container or ro/ro gang shall consist of six (6) hustler drivers or five (5) straddle carrier drivers, depending upon the equipment used by the Employer.

**(b) Small Boat Gangs.** The size of a gang working a small boat, which is defined as a container ship with a capacity no greater than 500 twenty-foot equivalent units, shall be ten (10) employees, consisting of one (1) hatch foreman and nine (9) longshoremen, if the gang is engaged in lift-on/lift-off ("lo/lo") operations, or seven (7) employees consisting of a hatch foreman and six (6) longshoremen, if the gang is engaged in ("ro/ro") operations.

**(c) Feeder Barge Gang.** The size of a longshore gang working a containerized, non-self-propelled barge containing not more than eighty (80) containers shall be seven (7) longshoremen, consisting of one (1) hatch foreman and six (6) longshoremen. In addition, four (4) drivers shall be assigned to the gang. If the non-self-propelled barge is carrying more than eighty (80) but fewer than three hundred fifty (350) containers, the size of the longshore gang working that barge shall be eight (8) longshoremen, consisting of one (1) hatch foreman and seven (7) longshoremen. In addition, six (6) drivers shall be assigned to the gang.

**(d) Stuffing/Stripping Gang.** The minimum size of a stuffing and stripping gang for loading and unloading containers shall be one (1) longshoreman and one (1) checker, who shall work as directed on one or more containers or trucks simultaneously.

(e) **General Cargo Breakbulk Gang.** The minimum number of employees in a gang when loading or discharging general cargo breakbulk shall be sixteen (16) employees, consisting of one (1) hatch foreman, three (3) deckmen, eight (8) holdmen, and four (4) dockmen. Drivers are not included in the foregoing complement.

(f) **Banana Gang.** When loading or discharging uncontainerized bananas, a gang shall consist of fourteen (14) longshoremen, consisting of one (1) hatch foreman, three (3) deckmen, six (6) holdmen, and four (4) dockmen. Drivers are not included in the foregoing complement.

(g) **Car Gangs.** A car gang loading and discharging an automobile ship shall consist of the same number of employees as a general cargo breakbulk gang with as many additional drivers added as may be needed.

(h) **Bulk Sugar Gang.** The minimum size of a gang working a bulk sugar ship shall be twelve (12) longshoremen. The shop steward is included in the minimum gang size. The bulk sugar operation shall also include one (1) timekeeper, one (1) ship clerk, and one (1) hiring agent.

(i) **Conveyor Belt/Sideport Gang.** When working mechanized conveyor belt and sideport operation ships, a gang shall consist of a minimum of fourteen (14) longshoremen, including drivers, plus a hatch foreman. No more than two (2) drivers shall be added for dock operations.

(j) **Scrap Gang.** The minimum number of employees in a scrap steel or salt gang shall be five (5) longshoremen, consisting of one (1) hatch foreman and four (4) longshoremen. In addition, a scrap steel or salt operation shall have one clerk paid at a maximum of eight (8) hours per day.

(k) **Lumber Gang.** The minimum size of a lumber gang shall be eleven (11) longshoremen, consisting of one (1) hatch foreman, two (2) deckmen, four (4) dockmen, and four (4) holdmen. Drivers are not included in the foregoing complement.

(l) **Specialty Gangs.** As to specialty gangs, such as uncontainerized newsprint, cork, wood pulp, burlap, copper, logs, heavy lifts, and such other commodities as may from time to time be handled in the Port, the composition of these gangs shall be mutually agreed upon among the Employer, the ILA, and the local unions involved.

(m) **Offshore Steel Gang.** When handling steel offshore, the gang shall consist of a minimum of twelve (12) longshoremen and one (1) hatch foreman. If general cargo is also handled on the same ship, the gang shall be the same size as the general cargo breakbulk gang for the entire operation. If, however, any of the uncontainerized specialty cargo referred to in this section is handled on the same ship but no other general cargo is handled, the gang shall consist of a minimum of twelve (12) longshoremen and one (1) hatch foreman, while handling such specialty cargo.

**Section 2.       -Relief Structure for Container Operations**

The following relief structure shall apply to container operations:

- Hatch Foremen          1 hired/1working (full time)
- Crane Operators          3 hired/1 working
- Hold/Dock Men          6 hired/4 working
- Drivers (hustler)          6 hired/4 working
- Drivers (straddle)          5 hired/3 working
                              (vessel operations only)

The following container handling equipment: — top loaders, reach stackers, transtainers, straddle carriers, and rubber tire gantries — whether used in connection with terminal (field) operations or vessel operations shall be manned as follows: three (3) drivers shall be assigned to operate two (2) machines on a rotating basis and when only one (1) machine is required, then two (2) drivers shall be assigned to operate one (1) machine on a rotating basis. However, for vessel operations, straddle carriers shall be manned as follows: five (5) straddle carrier drivers shall be assigned to operate three (3) straddle carriers on a rotating basis.

**Section 3.       Checkers**

One (1) checker shall be assigned to each longshore gang as required by Article V, Section 4 of the Master Contract. When two (2) cranes are working, one (1) extra checker shall be hired for relief; when three (3) or four (4) cranes are working, two (2) extra checkers shall be hired for relief; when five (5) or more cranes are working, three (3) extra checkers shall be hired for relief. These minimum checker staffing requirements shall apply from the start of a vessel. There shall be one checker behind each truck when it is being worked.

**Section 4. Maintenance Employees**
All maintenance operations shall employ a minimum of two (2) maintenance employees and a maintenance foreman.

**Section 5. Timekeeper**
A timekeeper shall be employed at all times when a gang is working.

**Section 6. Receiving and Delivery Clerk**
There shall be at least one Receiving or one Delivery Clerk employed whenever a ship is working.

**Section 7. Flexibility**
Notwithstanding any provision in this Agreement to the contrary, the following elements of flexibility in the assignment of employees and the use of equipment shall apply:

**(a)** Employers shall be required to hire only the number of terminal labor, clerks, checkers, marine carpenters, maintenance employees, and cargo repair workers as may be necessary to perform the work. Frozen details shall be eliminated. Implementation of this provision is subject to the following:

**(i)** Detail men (clerks, checkers, and terminal labor only) will continue to be employed when, in the judgment of the Employer, the detail for which they are normally engaged is active. Such detail men, when ordered in, shall be assignable at the discretion of the Employer to any other productive work within their craft jurisdiction.

**(ii)** Clerks hired during the regular work period to perform office work shall not be transferred to other duties on the dock during that period.

**(b)** Employers shall have the right to distribute the members of the gang to any assignment within the gang which they are qualified to perform.

**(c)** Extra employees that may be added to a gang may be transferred from gang to gang as needed.

**(d)** Flexibility shall not extend to the interchange of gang and terminal assignments.

**(e)** Gangs may be transferred from hatch to hatch and from ship to ship within the same terminal, provided such transfer does not cause displacement of another gang.

**(f)** There shall be flexibility in the assignment of all crafts, within their work category, to work as directed.

**(g)** Implementation of the provisions in this section are subject to the test of safety and health as well as reasonable standards of workload upon one or more employees.

## ARTICLE VIII
### EMPLOYEE BENEFITS

**Section 1. MILA**
The Management-ILA Managed Health Care Trust Fund ("MILA") was established pursuant to the terms of the Master Contract for the purpose of administering an employee welfare benefit healthcare plan covering eligible active and retired dockworkers and their dependents in certain Atlantic and Gulf Coast ports covered by the Master Contract, including the Port of New York and New Jersey. The Master Contract establishes how MILA, which is a defined contribution welfare plan, is funded and how active employees and retirees become eligible for MILA benefits. MILA provides medical, surgical, hospitalization, mental health and substance abuse, and pharmacy benefits. A description of the type and extent of benefits provided and the requirements a participant must meet to be eligible to receive those benefits are set forth in MILA's plan documents. The provisions of these plan documents are summarized in summary plan descriptions that can be obtained from MILA's office, which is located at 111 Broadway, New York, New York 10006-1901 (Telephone No. 212-766-5700). The Master Contract requires amendments to MILA's plan documents that will be in effect during the term of this Agreement.

**Section 2. -NYSA-ILA Medical and Clinical Services Fund**

The NYSA-ILA Medical and Clinical Services Fund ("MSCF") provides to eligible active and retired employees covered by this Agreement dental and optical benefits as well as outpatient network medical services. During the term of this Agreement the benefits to be provided by the MCSF and the requirements a participant must meet to be eligible to receive those benefits are set forth in the MCSF's Summary Plan Description dated November 2003, as amended by a Summary of Material Modifications dated December 6, 2004. Copies of these documents can be obtained from the MCSF's office, which is located at 45 Broadway, New York, New York 10006-3007 (Tel. No.1-212-898-9140).

### Section 3.     NYSA-ILA Welfare Fund

The NYSA-ILA Welfare Fund ("WF") provides to eligible active and retired employees covered by this Agreement and their dependents life insurance, death benefits, spousal death benefits, accidental death and dismemberment benefits, weekly non-occupational disability benefits, unreimbursed MILA-recognized Medicare medical expenses, and certain reduced healthcare benefits. During the term of this Agreement the benefits to be provided by the WF and the requirements a participant must meet to be eligible to receive these benefits are set forth in the WF's Summary Plan Description dated November 2003, as amended by a Summary of Material Modifications dated December 2004. Copies of these documents can be obtained from the WF's office, which is located at 45 Broadway, New York, New York 10006-3007 (Tel. No. 1-212-898-9140).

### Section 4.     NYSA Supplemental Welfare Fund

In December in each of the calendar years from 2005 through 2010 the NYSA shall provide an annual supplemental welfare payment of $400 to each pensioner and widow who as of September 30, 2004, was in pay status receiving pension benefits from the NYSA-ILA Pension Trust Fund. The NYSA shall also provide such benefits to the widow of a deceased pensioner, if prior to the pensioner's death the pensioner was in such pay status on September 30, 2004.

### Section 5.     NYSA-ILA Pension Trust Fund

The NYSA-ILA Pension Trust Fund ("PTF") is a defined benefit pension plan that provides pension benefits to eligible employees and retirees covered by this Agreement and their beneficiaries. The provisions governing the rights of participants to receive benefits from the PTF are set forth in the PTF's Agreement and Declaration of Trust and Plan, as amended and restated on January 29, 2002, and as further amended by resolutions adopted by the PTF's Board of Trustees on May 6, 2002, November 8, 2002, and April 15, 2003 ("PTF Plan"), and as further amended as follows:

(a) A Participant actively employed in the longshore industry with at least one year of credited service after September 30, 2003, but not receiving any pension benefits from the PTF Plan, who retires on or after October 1, 2004, on a Service Retirement Pension or a Vested Rights Pension shall receive One Hundred Twenty ($120.00) dollars per month for each year of credited service. Participants who as of September 30, 2004, are receiving pension benefits from the PTF Plan while continuing to be employed in the longshore industry shall not be entitled to any adjustment in their pension benefits for service prior to October 1, 2004, but if they continue to be employed in the longshore industry after October 1, 2004, they will accrue additional pension benefits of One Hundred Twenty ($120.00) dollars per month for each year of credited service after September 30, 2004.

(b) A Participant with at least one year of credited service after September 30, 2003, who files for a Disability Pension on or after October 1, 2004, shall receive $90.00 per month for each year of credited service, if such Participant satisfies the credited service and other requirements for a Disability Pension currently in effect in the PTF Plan, and when such Participant attains age sixty (60), such Participant thereafter shall receive One Hundred Twenty ($120.00) dollars per month for each year of credited service that the Participant had earned prior to his retirement on a Disability Pension.

(c) Any person who is not a Participant as of September 30, 2004, and who has been hired for employment in the longshore industry as a new employee on or after October 1, 1996, shall be eligible to participate in the PTF Plan effective October 1, 2004, but shall not be entitled to accrue credited service for pension benefit accrual purposes under the PTF Plan for any hours of employment earned prior to October 1, 2004.

**(d)** Effective October 1, 2004, a Participant shall be eligible to receive upon retirement a Service Retirement Pension, if the Participant has reached age sixty (60) and has also satisfied the credited service requirements for a Service Retirement Pension currently in effect in the PTF Plan.

**(e)** Any Participant actively employed in the longshore industry with at least one year of credited service after September 30, 2003, but not receiving pension benefits from the PTF Plan, who has reached the age of fifty-eight (58) with a minimum of twenty-five (25) years of credited service and who during a six-month window period, commencing October 1, 2004, and ending on March 31, 2005, retires from and ceases employment in the longshore industry, shall be eligible to receive upon retirement a Service Retirement Pension without actuarial reduction.

**(f)** Any Participant actively employed in the longshore industry with at least one year of service after September 30, 2003, but not receiving pension benefits from the PTF Plan, who has reached age fifty-eight (58) with a minimum of twenty-five (25) years of credited service and who retires from and ceases employment in the longshore industry after March 31, 2005, shall be eligible to receive upon retirement an early retirement benefit equal to One Hundred Twenty ($120.00) dollars per month for each year of credited service actuarially reduced by 0.75% for each month between the first day of the month following the date of retirement and the first day of the month following the date of the Participant's sixtieth (60th) birthday.

All other terms and provisions of the PTF Plan shall remain in full force and effect without change during the term of this Agreement. Those terms and provisions are summarized in the PTF's Summary Plan Description dated July 2003, as amended by a Summary of Material Modifications dated September 2004. Copies of these documents can be obtained from the PTF's office, which is located at 45 Broadway, New York, New York 10006-3007 (Tel. No. 1-212-898-9174).

**Section 6.      -NYSA-ILA Money Purchase Pension Fund and Plan**

The NYSA-ILA Money Purchase Pension Fund and Plan ("MPPF") is a defined contribution pension plan that provides pension benefits to eligible employees and retirees covered by this Agreement and their beneficiaries. The benefits to be provided by the MPPF and the requirements a participant must meet to be eligible to receive these benefits are set forth in the MPPF's Summary Plan Description dated September 2003, a copy of which can be obtained from the MPPF's office, which is located at 45 Broadway, New York, New York 10006-3007 (Tel. No. 1-212-898-9174).

**Section 7.      NYSA-ILA Vacation and Holiday Fund**

The NYSA-ILA Vacation and Holiday Fund ("VHF") provides vacation and holiday benefits to eligible employees covered by this Agreement. There are sixteen holidays for which holiday payments are made to eligible employees: Columbus Day, Election Day, Veterans' Day, Thanksgiving Day, Christmas Day, New Year's Eve, New Year's Day, Martin Luther King's Birthday, Lincoln's Birthday, Washington's Birthday, Teddy Gleason's Birthday (celebrated on March 17), Good Friday, Memorial Day, Independence Day (July 4), and Labor Day. During the term of this Agreement the holiday and vacation benefits to be provided by the VHF are set forth in the VHF's Summary Plan Description dated May 2001, a copy of which can be obtained from the VHF's office, which is located at 45 Broadway, New York, New York 10006-3007 (Tel. No. 1-212-898-9196).

**Section 8.      NYSA-ILA Container Royalty Fund**

The NYSA-ILA Container Royalty Fund ("CRF") provides container royalty payments to eligible employees covered by this Agreement. The provisions governing the rights of participants to receive payments from the CRF are set forth in the CRF's Agreement and Declaration of Trust, as amended and restated on March 8, 2001, and as further amended by a resolution adopted by the CRF's Board of Trustees on December 16, 2003. During the term of this Agreement the payments to be provided by the CRF are set forth in the CRF's Explanation of the NYSA-ILA Container Royalty Fund dated May 2001, a copy of which can be obtained from the CRF's office, which is located at 45 Broadway, New York, New York 10006-3007 (Tel. No. 1-212-898-9196).

**Section 9.      NYSA-ILA GAI Fund**

The NYSA-ILA GAI Fund ("GAI Fund") provides Guaranteed Annual Income ("GAI") benefits to eligible employees covered by this Agreement. The purpose of the GAI Fund is to provide benefits to longshoremen whose work opportunities were eroded by containerization. The provisions governing the rights of participants to receive benefits from the GAI Fund are set forth in the GAI Fund's Agreement and Declaration of Trust and Plan, as amended and restated on November 30, 2000 ("GAI Plan"). During the term of this Agreement the benefits to be provided by the GAI Plan and the requirements a participant must meet to be eligible to receive those benefits are set forth in the GAI Fund's Summary Plan Description dated May 2001, a copy of which can be obtained at the GAI Fund's office, which is located at 45 Broadway, New York, New York 10006-3007 (Tel. No. 1-212-898-9192).

**Section 10.    NYSA-ILA Scholarship Fund**

The NYSA-ILA Scholarship Fund ("SF"), also known as the Teddy Gleason Scholarship Program, provides college-level financial assistance (scholarships) to dependents of eligible employees covered by this Agreement. The selection is made by an outside professional organization (Scholarship and Recognition Program, Educational Testing Service) that evaluates all scholarship applications submitted to the SF. The provisions governing the scholarship awards provided by the SF are set forth in the SF's Agreement and Declaration of Trust and Plan, as amended and restated in June 2004 ("SF Plan"), a copy of which can be obtained at the SF's office, which is located at 45 Broadway, New York, New York 10006-3007 (Tel. No. 1-212-208-0220).

**Section 11.    Duplication of Coverage**

In the event an Employer now individually provides insurance, pensions or other welfare benefits for its own employees, such employees shall choose either the benefits so provided or the benefits of a generally similar nature available under the NYSA-ILA Welfare Plan, the NYSA-ILA Medical and Clinical Services Plan, the NYSA-ILA Pension Plan or the NYSA-ILA Money Purchase Pension Plan. The intent of this provision is to eliminate duplication of coverage.

## ARTICLE IX
### FUNDING OF EMPLOYEE BENEFITS

**Section 1.    NYSA-ILA Assessment Agreement**

Except as noted below, the costs and related administrative expenses for the employee benefits described in Article VIII of this Agreement, the hourly contributions required under the Master Contract to the Management-ILA Managed Health Care Trust Fund, the supplemental cash benefits in lieu of travel time, and the costs of administering this Agreement, including the administrative expenses of the NYSA, shall be funded in accordance with the provisions of the NYSA-ILA Assessment Agreement, which is appended to this Agreement as Annex C. The exceptions to the foregoing are non-hourly contributions to MILA, container royalty benefits and scholarship benefits. The supplemental cash benefits in lieu of travel time consist of an annual payment of $2 million that is transferred to the NYSA-ILA Container Royalty Fund for distribution to employees as part of their container royalty payments. The costs of container royalty payments provided by the CRF and scholarship awards provided by the SF are funded through the collection of the First and Third Container Royalties imposed by Article XI of the Master Contract.

**Section 2.    -NYSA-ILA Fringe Benefits Escrow Fund**

The NYSA-ILA Fringe Benefits Escrow Fund ("FBEF") is a joint labor-management trust fund created by the NYSA and the ILA that does not directly provide any employee benefits. The FBEF acts as a conduit fund for other NYSA-ILA Funds (except the PTF, the MPPP, the CRF and the SF). The assessments under the NYSA-ILA Assessment Agreement are paid to the NYSA, which then transfers these assessments to the FBEF, the NYSA-ILA Pension Trust Fund ("PTF"), and the NYSA-ILA Money Purchase Pension Fund ("MPPP"). Since the Internal Revenue Service does not permit the commingling of pension benefits and non-pension benefits, the contributions earmarked for the PTF and the MPPP are paid directly by the NYSA to those pension funds. The FBEF then transfers the money it receives from the NYSA to those NYSA-ILA Funds (except the CRF and the SF) that do not provide pension benefits. The FBEF's governing trust instrument is the FBEF's Agreement and Declaration of Trust dated August 15, 1972, effective as of October 1, 1972.

**Section 3.    Funding of Pensions**

For pension benefits provided by the NYSA-ILA Pension Trust Fund ("PTF") to employees covered by this Agreement and their beneficiaries, the assessment rates under the NYSA-ILA Assessment Agreement shall provide sufficient annual contributions to fund the normal cost of such PTF pension benefits as defined in the actuarial valuations of the PTF's plan actuary, including the PTF's administrative expenses, and to amortize over a nineteen-year period commencing January 1, 2004, the unfunded actuarial accrued liability for such benefits as defined in the actuarial valuations of the PTF's plan actuary. The contributions to the NYSA-ILA Money Purchase Pension Plan shall be $2.00 per hour of work of which the employee's Employer shall pay $1.00. The other $1.00 will be funded by the NYSA-ILA Assessment Agreement, which shall also fund the $2.00 per hour contributions due on GAI equivalent hours.

**Section 4.    Funding of Welfare Benefits**

The assessment rates under the NYSA-ILA Assessment Agreement shall provide sufficient contributions to fund (i) the hourly contributions required by Section 2(c) of Article XII of the Master Contract to be paid to the Management-ILA Managed Health Care Trust Fund and (ii) the cost of providing the benefits that were in effect on September 30, 2004, on the Schedule of Benefits of the NYSA-ILA Welfare Fund and the NYSA-ILA Medical and Clinical Services Fund.

## ARTICLE X
### CONTRACT ADMINISTRATION

**Section 1.    Contract Board**

**(a) Powers.** In order to provide for uniformity in the administration of the provisions of this Agreement and of the various employee benefit funds and in order to encourage the increase of productivity to permit the Port of New York and New Jersey to retain and to increase the work opportunities of its employees, the implementation and administration of this Agreement is hereby placed in the hands of a joint labor-management body known as the NYSA-ILA Contract Board (hereinafter "Contract Board"or "Board"). The jurisdiction of the Contract Board shall include all matters relating to the provisions of this Agreement and all employee benefit funds. The Contract Board shall develop and administer all necessary standards and policies with respect to the various contractual provisions and employee benefit plans and shall have the authority to make such amendments to this Agreement and to the employee benefit trust agreements as the Board may determine, subject, however, to ratification by the Board of Directors of the NYSA and by the Executive Committee of the ILA, which amendments and ratifications shall not be arbitrable. All other bodies provided by this Agreement, such as the NYSA-ILA Labor Relations Committee, the NYSA-ILA Seniority Board, and the NYSA-ILA Work Practices Committee, shall receive their policy instructions from the Contract Board, and their actions shall be reported in writing to and be ratified by the Contract Board.

**(b) Structure.** The Contract Board shall consist of not less than five (5) and not more than ten (10) ILA officials and not less than five (5) and not more than ten (10) NYSA executive-level representatives of marine terminal members, contracting stevedore members, or carrier members of the NYSA who are directors of the NYSA. The NYSA members shall be designated by the Board of Directors of the NYSA, and the ILA members shall be designated by the Executive Committee of the ILA. The President of the ILA and the President of the NYSA shall be two (2) of the members of the Contract Board and shall act as Co-Chairmen of the Contract Board. Each side of the Contract Board shall have a total of five (5) votes. No alternates for any member of the Contract Board shall be designated, and no proxies may be appointed. The by-laws and rules of procedure adopted by the Contract Board shall guide proceedings of the Board. The Contract Board shall appoint Co-Counsel to the Board and such other employees, agents, or other representatives as may be needed. The Contract Board may establish such office as may be necessary to carry out the functions and policies of the Contract Board.

**(c) Meetings.** The Contract Board shall meet quarterly, subject to the availability of the members of the Contract Board Special meetings may be called to deal with emergency matters on short notice, which may be in any form, including telegraphic, facsimile, or telephonic. The regular meetings of the Contract Board shall act on an agenda prepared prior to the meeting by the Co-Chairmen. Such agenda setting forth the subject(s) to be discussed and the proposed action(s) to be

taken shall be circulated to each member of the Contract Board, when possible, in sufficient time prior to the meeting to permit each side to consult with its own members and to determine the position of each side to be presented to the meeting. If a quorum of either side fails to attend, the other side may proceed to act upon the business for which the meeting was called, as if a quorum of the other side were present. The actions taken by the side which is in attendance shall be deemed to have been voted against by the other side, thus resulting in a deadlock vote of the Contract Board. Any and all matters (except amendments to this Agreement and to the employee benefit trust agreements) resulting in a deadlock vote shall be referred to immediate arbitration in accordance with this Agreement.

**(d) Selection of Fund Trustees.** There shall be selected from the members of the Contract Board trustees of the various jointly administered employee benefit funds provided for under this Agreement, and each side agrees to designate only representatives on the Contract Board or officers of the NYSA as trustees of these funds.

### Section 2.     NYSA-ILA Work Practices Committee

The NYSA-ILA Work Practices Committee consisting of the President of the ILA, the President of the NYSA, and four (4) or more other members from each side shall implement all contractual provisions relating to hiring, training, safety, and all work practices necessary to enhance productivity. The Work Practices Committee shall also serve as a Contract Implementation Committee. It shall be the duty of such Work Practices Committee to see that all provisions of this Agreement and of the Master Contract are fully implemented and carried out by the ILA and by the Employers and their supervisory employees as well as by all employees covered by this Agreement. The Work Practices Committee shall effectuate the parties' intent to achieve the following objectives that will serve the best interests of both Union and Management in the Port of New York and New Jersey:

- -Comply with the Master Contract's directive to establish for all crafts certification guidelines for new employees and re-certification guidelines for existing employees;
- -Establish a system that will allow Employers to assign drivers to serve more than one gang;
- -Establish a system that will allow Employers to retain only the necessary number of car drivers after the guarantee period; and
- -Implement and monitor measures to improve productivity, reduce costs, create new efficiencies, and identify and pursue best work practices.

### Section 3.     Productivity Improvement

The parties shall work together in good faith to reduce redundancy, excess positions, and duplication of jobs by attrition, reassignment, or otherwise on terminals and ships in order to improve their productivity and enhance the competitive position of the Port of New York and New Jersey. The NYSA-ILA Contract Board shall implement this provision. Any chance of reacquiring the work of stuffing and stripping containers requires a dedicated work force of trained, productive workers hired at compensation commensurate with the local competition and without any restrictive rules.

### Section 4.     Controlling Vacations

The NYSA-ILA Contract Board has approved a system to control the scheduling of vacations for all employees. Seniority shall be used as a criterion in limiting the number of employees who can take vacations per week in order to assure the continued availability of adequate labor. This system shall remain in effect during the duration of this Agreement.

**ARTICLE XI**
**NEW EMPLOYEES**

Any request for a controlled opening of the Waterfront Commission Register shall be made only by the Contract Board and not by any Employer or Union Representative. In opening the register for new employees, the Contract Board shall develop a program with the Waterfront Commission of New York Harbor that shall provide as follows:

**(a)** In order for a new employee to be eligible for employment, that employee must successfully complete the Waterfront Commission screening process and obtain a Waterfront Commission registration.

**(b)** In addition, any offer of employment that an applicant receives is contingent upon, among other things, satisfactory completion of a medical examination conducted by an industry-designated examining physician and an alcohol and drug test conducted by a professional testing company and a determination by the Contract Board and its designated examining physicians that the employee is capable of performing the essential functions of the job offered with or without reasonable accommodation without posing a direct threat to the health and safety of individuals in the workplace. As a condition of continued employment, employees may also be required to undergo periodic medical examinations and alcohol and drug screenings at times specified by the Contract Board. In connection with these examinations, employees are required to provide the Contract Board or the NYSA-ILA Accommodations Team with access to their medical records, if requested. All industry-required medical examinations and alcohol and drug screenings are paid for in full by the NYSA-ILA Welfare Fund.

**(c)** The Contract Board shall establish physical and psychological standards as well as performance standards for each of the various crafts. Satisfying these standards shall be demonstrated through the successful completion of physical agility or physical fitness tests in which an employee demonstrates the ability to perform actual or simulated job tasks or other job-related proficiency tests. Such tests will be approved by the NYSA-ILA Contract Board.

**(d)** Equipment operators and clerical and maintenance employees shall also be required to be re-certified under the physical, psychological, and performance standards every three (3) years.

**(e)** The first year of a new employee's employment shall be deemed a probationary period. Upon the completion of this probationary period, the Contract Board shall review the performance record of each new employee for disciplinary infractions, excessive absenteeism, performance difficulties, and other indications that the employee is not performing up to standards. The Contract Board may decide to terminate a new employee's employment or extend the probationary period for an additional six (6) months. Employees on extended probation will receive additional training to help them improve their job performance.

**(f)** The Contract Board shall assign each new employee to a sponsoring Employer in accordance with the needs of that Employer.

**(g)** Each new employee must comply with the union security clause as set forth in Article II, Section 3 of this Agreement.

**(h)** New employees must accept any and all work offered to them by their sponsoring Employer. The failure to do so will result in disciplinary action by the sponsoring Employer.

### ARTICLE XII
#### DISPATCHERS

**Section 1.**     **Responsibilities**

Dispatchers shall have the responsibility of overseeing the dispatching of additional employees to assure compliance with the contractual provisions relating to the hiring and assignment of employees under this Agreement. Dispatchers shall not engage in the hiring of employees except as provided in applicable Waterfront Commission regulations. Dispatchers shall participate in the operation of the telecommunications hiring system by handling telephone calls to the hiring center. Dispatchers shall be subject to removal from office by the Contract Board for failure to carry out their responsibilities.

**Section 2.**     **Selection of Dispatchers**

The Contract Board shall select the dispatchers who shall be assigned to the employment information center. There shall be no more than (8) dispatchers. The salaries of the dispatchers and the expenses of the Contract Board shall be paid by the NYSA.

### ARTICLE XIII
#### LONGSHOREMEN'S SENIORITY

**Section 1.**     **Seniority**

Longshoremen shall be hired on the basis of seniority in conformance with the terms set forth in this Article XIII. Seniority is defined as the basis upon which gangs and individuals are accorded priority of employment.

### Section 2. Definitions

**(a) Regular Gang.** A group of longshoremen attached to a specific pier or terminal and hired as a unit to load and unload ships at that pier or terminal shall be known as a "Regular Gang." A Regular Gang shall be registered with the NYSA-ILA Seniority Department and posted at the terminal by a list indicating: gang number and the names, Social Security numbers, and Waterfront Commission registration numbers of the members of the gang. A Regular Gang shall have preference in employment at its regular pier or terminal. A Regular Gang or member of a Regular Gang or a Regular List Employee employed at a location other than the regular pier or terminal of the Regular Gang or Regular List Employee must return to that regular pier or terminal when ordered in by the direct Employer at the regular pier or terminal.

**(b) Regular List Employees.** Individual longshoremen registered on a list as having priority of employment at a specific pier or terminal shall be known as "Regular List Employees." Regular List Employees shall have preference in employment at their regular piers or terminals.

### Section 3. Gangs

**(a) Seniority Rights - Employment of Gangs.** Employees when hired as a gang shall be accorded the seniority rights of the gang as a unit. Available gangs will be offered employment at a specific pier or terminal in accordance with the following priority: Regular Gangs at that pier or terminal are hired first. If the direct Employer's needs are not filled, then additional gangs will be hired with first preference given to gangs in the section where the Employer's terminal is located and then to gangs from other sections in accordance with the hiring section sequence set forth in Article XVI, Section 2(j) of this Agreement.

**(b) Equalization of Earnings.** The Employers shall hire their Regular Gangs on a rotating basis so as to equalize the earnings of their Regular Gangs.

### Section 4. Permanent Vacancies in Regular Gangs

**(a) Order of Priority.** Permanent vacancies in a Regular Gang shall be filled from among available qualified employees in the following order of priority in accordance with their seniority at such pier or terminal and, where such seniority is equal, on the basis of seniority in the industry, the employee with the greatest seniority having first choice, but all employees in the same alpha-seniority classification shall be considered to have identical seniority in the industry:
- FIRST -From among members of Regular Gangs identified with that pier or terminal.
- SECOND -From the Regular List Longshoremen identified with that pier or terminal.
- THIRD -From the employees at other piers and terminals in the section on the basis of their seniority in the section.
- FOURTH -From employees in other sections in accordance with the section sequence set forth in Article XVI, Section 2(j) of this Agreement, on the basis of their alpha-seniority designations in the industry, the employee with the greatest seniority having first choice, but all employees in the same alpha-seniority classification shall be considered to have identical seniority in the industry.

**(b) T and Lower Seniority.** Longshoremen with alpha-seniority designations from "A" to "T" can fill permanent list openings for "Hold," "Ship Labor," and "Terminal Labor" in accordance with the provisions of Section 4(a) of this Article. Longshoremen with lower alpha-seniority designations cannot apply for permanent "Hold," "Ship Labor," and "Terminal Labor" list openings except for positions at passenger ship terminals.

### Section 5. -Permanent Vacancies for Regular List Positions

Permanent vacancies for Regular List Positions on a particular pier or terminal shall be filled from among available qualified employees in the following order of priority:
- FIRST -From among the Regular List Employees at the pier or terminal where the vacancy exists in accordance with their seniority at such pier or terminal, and where pier seniority is equal, then industry seniority shall control, with the employee with the greatest industry seniority

having first choice, but all employees in the same alpha-seniority classification shall be considered to have identical seniority in the industry.

• SECOND -From among members of Regular Gangs identified with that pier or terminal in accordance with their pier or terminal seniority, the employee with the greatest pier or terminal seniority having first choice and where pier seniority is equal, then industry seniority shall control, with the employee with the greatest industry seniority having first choice, but all employees in the same alpha-seniority classification shall be considered to have identical seniority in the industry.

• THIRD    -From employees on the Employer's sponsored list at the pier or terminal and from employees identified with other piers or terminals in the same section on the basis of their seniority within the section, and where section seniority is equal, then industry seniority shall control, with the employee with the greatest industry seniority having first choice, but all employees in the same alpha-seniority classification shall be considered to have identical seniority in the industry, except that within each alpha-seniority classification in the section, the direct Employer must first choose employees on the Employer's sponsored list in that alpha-seniority classification.

• FOURTH -Thereafter, from employees in other sections in accordance with the section sequence set forth in Article XVI, Section 2(j) of this Agreement on the basis of their alpha-seniority designation in the industry, the employee with the greatest seniority having first choice, but all employees in the same alpha-seniority classification shall be considered to have identical seniority in the industry.

**Section 6.     -Piers or Terminals Reopened within Three Years after Disuse**

(a) **Gangs**. On a pier or terminal which is reopened within three calendar years of its disuse, seniority rights in employment for Regular Gangs shall be accorded as follows:

• FIRST     -From among the Regular Gangs that are identified with such pier or terminal selected on the basis of their gang seniority as defined above at such pier or terminal, provided the gang is available for work substantially intact.

• SECOND -From among the Regular Gangs in the section, provided they are available for employment at such pier or terminal as intact gangs.

• THIRD    -From among Regular Gangs from other sections, provided they are available for employment at such pier or terminal as substantially intact gangs.

(b) **Regular List Positions.** Regular List Positions shall be filled in accordance with Section 5 of this Article.

**Section 7.     -New Piers and Piers and Terminals Reopened More than Three Years after Disuse**

(a) **Gangs.** On new piers and on piers and terminals reopened after having been in disuse for over three calendar years, seniority rights in employment for gangs shall be accorded as follows:

• FIRST     -From among Regular Gangs in the section, provided they are available for employment as Regular Gangs at such pier or terminal.

• SECOND -When no Regular Gangs are available in the section or when more gangs are required than are available, the Employer shall form and register new gangs in accordance with the provisions of Section 4 of this Article.

(b) **Regular List Positions.** Regular List Positions shall be filled in accordance with Section 5 of this Article.

**Section 8.     Measuring Seniority**

(a) **Types of Seniority**. Seniority for the purposes of this Article shall be computed on the basis of pier, section, and industry seniority as more fully set forth in this Article. The following principles shall apply:

(i) **Length of Service** shall be based upon employment as a longshoreman, and work as a chenango and as a public loader prior to December 1, 1953, shall be considered service for which seniority credit as a longshoreman will be allowed. The NYSA-ILA Seniority Board shall be the sole judge of the sufficiency of the evidence of such service.

(ii)  **Pier Seniority** shall mean continuous service as a longshoreman at a particular pier or terminal with which the employee is identified.

(iii)  **Industry Seniority** shall mean continuous service in the industry as a longshoreman in the Port of New York and New Jersey but all employees in the same alpha-seniority classification shall be considered to have the same industry seniority.

(b)  **Seniority Groups.**  Employees covered by this Article shall be classified in designated alpha-seniority groups beginning with "A" seniority in accordance with various standards.

(c)  **Contract Year.**  As used in this Article, the term "contract year" shall be defined as a twelve-month period ending September 30.

(d)  **Continuous Service.**  As used in this Article, the term "continuous service" means employment in the industry as a longshoreman that is not interrupted by two or more consecutive contract years of no work or credited hours.  An employee must have continuous service to retain pier, section, and industry seniority.

(e)  **Allowable Breaks In Service.**  An employee may receive credit for allowable breaks in service which are due to:

(i)  Absence due to verifiable illness or injury;

(ii)  Absence due to military service, provided the employee is reinstated in the industry in compliance with the requirements of law as to re-employment;

(iii)  Absence due to a leave of absence up to a maximum period of 12 calendar months, provided such leave is authorized in accordance with the leave of absence procedure promulgated by the NYSA-ILA Contract Board, a copy of which is appended to this Agreement as Annex D;

(iv)  Absence due to service in a supervisory or managerial position;

(v)  Absence due to a period of service as an officer of the ILA or  any of its subdivisions; and

(vi)  Absence due to inability to obtain registration from the Waterfront Commission, provided that such registration is subsequently granted by the Commission and provided that the employee shall receive no credit as time worked during the period for which the employee was denied registration.  Seniority accumulated prior to the date of denial of registration shall be unaffected by such denial and shall be credited to the employee.

(f)  **Date of Measurement.**  Seniority shall be measured from the first day of October, 1945, which is the date when records were first kept by the New York Shipping Association Central Records Bureau.

(g)  **Break in Seniority.**  The seniority of a Regular List Position employee or the seniority of a member of a Regular Gang shall be broken with respect to priority of employment at the pier or terminal with which the employee is identified in the event the employee:

(i)  Voluntarily quits, resigns or retires; or

(ii)  Fails to work or be credited with at least one hour of service in the industry in two or more consecutive contract years, unless such failure is allowable within the standards specified in Section 8(e) of this Article.

(h)  **Loss of Gang Seniority.**  Each Regular Gang as a unit shall be accorded the seniority date of the year in which it was established as a Regular Gang at the particular pier, terminal or section with which it is identified and received the employment preference there as a Regular Gang.  The seniority rights of a Regular Gang as a unit shall be lost with respect to prior employment rights at the pier, terminal or section with which it is identified in the event the gang:

(i)  Voluntarily dissolves as an organized gang unit; or

(ii)  Voluntarily becomes disassociated with the pier, terminal, or section with which it is identified.

(i)  **Permanent Layoff.**  When it becomes necessary for an Employer to reduce the number of employees on a roster of Regular List Position employees in any category or classification of individual work, such reduction in force will be carried out by laying off the employees in the inverse order of seniority — the employee with the least seniority to be laid off first.  When it becomes necessary for an Employer to reduce permanently the number of Regular Gangs identified with a pier or terminal, they shall be laid off in the inverse order of gang seniority — the gang with the least seniority to be laid off first.

**Section 9.     Qualifications for Employment**

An employee employed for work under the terms of this Agreement must be qualified and able to perform the duties of the job for which he is employed. Nothing in this Article shall be construed to affect or limit any existing right of Employers, subject to the Grievance Procedure, to discharge employees for just cause.

**Section 10.     Removal from List or Gang Positions**

An individual who is on a list or gang will be permanently removed from that list position or gang for the following reasons:

**(i)** Withdrawal of company sponsorship;

**(ii)** Waterfront Commission strike-out (with right of appeal);

**(iii)** Waterfront Commission suspension for a period in excess of one year;

**(iv)** Failure to return timely after suspension for a violation under the collective bargaining agreement;

**(v)** Permanent bar from the industry for a violation under the collective bargaining agreement;

**(vi)** Failure to return timely after being granted a leave of absence;

**(vii)** Failure to return timely after military service; and

**(viii)** Failure to be employed on that list for a period in excess of one year, excluding persons on workers' compensation or non-occupational disability (A&H/TDB) or a person with a controverted workers' compensation claim.

**Section 11.     Effect of this Article**

Nothing in this Article shall be construed so as to affect or limit the right of Employers, subject to this Agreement, to discharge employees for cause.

## ARTICLE XIV
### CHECKERS/CLERKS' SENIORITY

**Section 1.     Classification of Seniority**

**(a) Definition of Seniority.** Seniority shall be defined as the basis upon which checkers and clerks are accorded priority of employment. Employees shall be classified into three (3) seniority groups as follows:

**(i)** -Master List;

**(ii)** Sub-Lists (Clerical, Dock Bosses, Detailmen); and

**(iii)** -Extras.

**(b) Master Lists.**

**(i)** All employees who maintain continuous service and who, on the basis of seniority, are accorded priority of employment at a pier or terminal shall be placed on the Master List at that pier or terminal in the order of their priority of employment. No employee shall be on the Master List of more than one (1) pier or terminal.

**(ii)** The lists on file with the NYSA-ILA Seniority Department, including all additions and deletions approved by the Seniority Department to date, shall be considered the bona fide Master Lists for each pier and terminal. All additions, deletions, or replacements to such lists must be submitted to the Seniority Department before such additions, deletions or replacements become effective.

**(iii)** Copies of all bona fide Master Lists shall be prepared and approved by the Seniority Department. The copies shall be submitted to the appropriate Employer occupying each pier and terminal and to other interested parties.

**(iv)** The procedure for adding employees to Regular Master Lists is as follows:

*Step 1.* -The Seniority Department will supply each Employer with a form on which the Employer shall indicate the present requirements for additional checkers and clerks because of attrition or increase in the size of the Employer's operations.

*Step 2.* -Additions requested by the Employer will be forwarded to the NYSA-ILA Seniority Department with the prior approval of the appropriate local union.

*Step 3.* -The Seniority Department shall notify all checkers and clerks in the Port of the list positions available. Those individuals seeking such jobs shall apply to the

Employer at the pier or terminal where the job is available by filling out an employment application form.

*Step 4.* -Those individual employees who apply to the Employer in accordance with these provisions may be immediately added in the order of their priority of employment to the Master List, subject only to prompt notification to the Seniority Department. Such notification shall be accompanied by copies of all applications received.

*Step 5.* -Each Employer shall, upon completion of the above process, submit its completed addition form to the Seniority Department.

**(c) Sub-Lists**

Sub-Lists shall consist of all employees who maintain continuous service and who, on the basis of their seniority position on the Sub-List and of their special qualifications, have priority of employment for clerical or detail assignments.

**(d) Extras**

Employees are considered extras who do not work regularly at a particular pier or terminal but who accept employment wherever it may be available and who have maintained continuous service in the industry as a checker or clerk. Extra employees, like all other checkers, clerks and timekeepers, shall be classified in an alpha-seniority group depending on length of service in the industry as a checker, clerk or timekeeper, in accordance with the various standards. Employees who are employed or available for employment at a pier or terminal other than the one with which they are regularly identified shall be considered extra for the period of such employment or availability for employment. The hiring agent has free selection from each alpha-seniority group with all employees in the same alpha-seniority classification considered to have the same industry seniority.

**(e) Maintenance and Use of Lists**

**(i)** The Employers shall maintain Master Lists and Sub-Lists on a current basis. All employees are to be given such identification by the NYSA-ILA Seniority Department as agreed upon to indicate their seniority classification. The Employers shall post such lists and any changes thereto at the appropriate piers or terminals. Thereafter, the clerks and checkers local union shall have thirty (30) days to protest any item, listing, classification, or omission. If no protest is made, such rosters, lists, seniority classifications, and other information shall be final and binding and shall become effective sixty (60) days after the date of the posting of the lists.

**(ii)** When an Employer requires a chief clerk or timekeeper at an outside berth, the Employer may secure such employees from any of the Master Lists and Sub-Lists maintained by that Employer.

**(iii)** When piers are rebuilt or combined to form one (1) pier, the seniority rights at the new pier shall be based on a consolidation of the various lists that existed at the piers prior to the changeover. Employees shall be dovetailed in by the Seniority Department in accordance with their initial dates of employment on their present lists.

**(iv)** At a pier or terminal which is reopened after having been in disuse for less than three (3) years, the Employer shall hire currently available qualified checkers from the Master List, if any, previously in effect at said pier or terminal. At a new pier or terminal or at a pier or terminal which has been in disuse for over three years, the Employer shall be allowed to hire any available qualified checkers on the basis of their alpha-seniority classifications.

**Section 2.     Seniority Groups**

Employers covered by this Article shall be classified in designated alpha-seniority groups beginning with "A" seniority in accordance with various standards.

**Section 3.     Timekeepers**

**(a)** All timekeepers employed by any Employer shall be placed on that Employer's seniority list.

**(b)** Timekeepers may be moved freely from pier to pier for the same Employer.

**(c)** Timekeepers may be chosen freely from any Master List of checkers and clerks at any piers at which an Employer is operating. If there is no qualified employee, the Employer may then select an employee from the bargaining unit of checkers and clerks.

**(d)** When a timekeeper is laid off due to lack of work, the timekeeper with the least company seniority shall be the first man laid off. If a job opens up as a timekeeper within a year, the employee in lay-off status shall have first preference for recall on the basis of company seniority.

**(e)** A timekeeper who is laid off by an Employer shall have the right to be restored to the employee's seniority position on the Master List.

### Section 4.   Qualifications for Employment

**(a)** An employee employed for any type of work as a checker, clerk, or timekeeper under this Agreement must be qualified and able to perform the duties of the job for which the employee is employed.

**(b)** The Seniority Department may administer a proficiency examination to determine the applicant's ability to follow written instructions, to complete forms, and otherwise to perform the tasks required of checkers and clerks. This examination may be given at the times and places and in the manner to be determined from time to time by the Seniority Department.

**(c)** If the applicant has passed all the required exams, the Seniority Department will notify the applicant by mail of that acceptance and will direct the applicant to the Waterfront Commission to obtain a Waterfront Commission registration. On the applicant's receipt of a Waterfront Commission registration, the Seniority Department will then by form advise the office of the local union or Employer representative of the applicant's acceptance and receipt of a registration. The local union or Employer representative shall sign such form and forward it to the Seniority Department for issuance of the applicant's seniority card. In no event shall the local union or Employer representative fail or refuse to sign such form because of membership or non-membership of the applicant in any labor organization.

### Section 5.   -Filling Job Vacancies; Layoffs; Promotions

**(a) Job Vacancies.** First preference in filling permanent job vacancies shall go to qualified employees on the Master List. When a job to which an employee is assigned is of a temporary nature, the Employer may choose an employee on the Master List or Sub-Lists. An employee on the Master List who is working elsewhere must return to that employee's own Employer when notified the preceding day that such work will be available.

**(b) Layoffs.** Layoffs on the Master List shall be in accordance with the standing of employees thereon, except that an Employer shall allow an employee who is engaged on a current work assignment to complete such assignment. Employees who are employed and classified as clericals, detail employees and dock bosses on Sub-Lists shall retain their Sub-List seniority for such work and shall not be affected by a layoff on the Master List. In the event a job on the Sub-List is temporarily or permanently discontinued, seniority shall govern, and the employee shall be entitled to return to the employee's seniority position on the Master List. Thereafter, if the detail is re-established, the employee who formerly was assigned to the detail shall have priority for the job, provided the employee has continued to be steadily employed at said pier or terminal.

**(c) Promotions.** Whenever a permanent detail or clerk's job is vacant, the preference for such job shall be given to the employee highest on the Master List, provided the employee meets the qualifications for the job.

### Section 6.   Continuous Service

Continuous service means employment in the industry as a checker, clerk, or timekeeper that is not interrupted by two or more consecutive contract years of no work or credited hours.

### Section 7.   Allowable Breaks in Service

**(a)** An employee shall maintain seniority during allowable breaks in service which are due to any of the following reasons:

   **(i)** Absence due to verifiable illness or injury.

   **(ii)** Absence due to military service, provided the employee is reinstated in the industry in compliance with the requirements of law as to re-employment.

   **(iii)** Absence due to a leave of absence up to a maximum of twelve (12) calendar months, provided such leave is authorized in accordance with the leave of absence procedure promulgated by the NYSA-ILA Contract Board, a copy of which is appended to this Agreement as Annex D.

(iv) Absence due to service in a supervisory or managerial position with an Employer-member of the NYSA, which involves the supervision of employees employed under this Agreement. Service of at least one (1) year of 700 hours' employment as a checker, clerk, or timekeeper must be established immediately prior to such break in checker employment. Prior seniority will be retained by supervisory personnel if the promotion from the pier is directly to service with the particular Employer operating the pier or terminal or with an Employer taking over the same operation and shall continue only so long as that supervisory or managerial position continues with the same Employer and will be contingent upon immediate return to the collective bargaining unit covered by this Agreement.

(v) Absence due to a period of service as an elected representative of Local 1, ILA, or employment by Local 1, ILA, provided that at least one (1) year of 700 hours of employment as a checker, clerk, or timekeeper is established in the year immediately prior to such break-in-service. Prior seniority will be retained by elected representatives of Local 1, ILA and employees of Local 1, ILA, during the duration of the employment or term in office and will be contingent upon immediate return to the collective bargaining unit covered by this Agreement.

(b) The seniority of any employee shall cease with respect to priority of employment in the event the employee voluntarily quits, resigns, retires, or is discharged for cause, or is absent without just cause and fails to notify the Employer within a reasonable time or fails to work or be credited with at least one hour of service in two or more consecutive contract years unless such failure is allowable within the standards specified in Section 7(a) of this Article.

### Section 8. -Transfers of Disabled Workers into Checker and Clerk Crafts

(a) Any individual employed in a craft covered by this Agreement who is injured in the course of employment with an Employer member of the NYSA and who, as a result of this injury, is subsequently unable to continue work in the employee's craft, may be awarded for the employee's prior work in that craft credit toward a checker seniority classification under the following terms and conditions:

(i) Written application for a checker seniority classification;

(ii) Submission of proof of a compensable job-related accident, details of the accident, nature of the injuries, period of lost time due to the accident, place and period of hospital confinement, and such other proof as shall be required by the Seniority Department;

(iii) Submission of competent medical proof certifying to the extent of the injury, the resulting inability to continue to work in that craft and the physical ability to work as a checker. However, such medical proof shall not be determinative of the issue of whether or not the individual shall receive credit for past service;

(iv) Consideration may be given to an individual who received a disabling injury in the course of active duty during military service; and

(v) The Committee on Seniority, PDO and Hiring of the Contract Board shall be the sole judge of the sufficiency of the evidence submitted in support of each individual case.

(b) Any such employee who transfers into the checker and clerk craft shall receive a seniority status based upon the year of the transfer.

### Section 9. Effect of this Article

Nothing in this Article shall be construed so as to affect or limit the right of Employers, subject to this Agreement, to discharge employees for cause.

ARTICLE XV
MAINTENANCE SENIORITY

### Section 1. Company Seniority

Company seniority shall be based on classification and length of service with the Employer. In the case of a lay-off, employees, if qualified, shall be recalled in order of company seniority.

### Section 2. Assignment of Employees

The Employer shall notify the maintenance local union having jurisdiction over the area where the Employer's facility is located when it needs maintenance employees to work and which

classifications are needed. It shall be the responsibility of such maintenance local union to furnish the necessary qualified maintenance employees requested by the Employer. In the event that such maintenance local union is unable to supply qualified employees, the Employer may secure the employees from any available source provided they abide by the union security clause set forth in Article II, Section 3 of this Agreement.

**Section 3.      -Piers or Terminals Reopened within Three Years after Disuse**

On a particular pier or terminal which is reopened within three calendar years of its disuse, seniority rights in employment for maintenance employees shall be accorded in the following order of priority:

• FIRST      -From among the Regular List employees identified with such pier or terminal selected on the basis of their seniority at such pier or terminal and where pier seniority is equal, then industry seniority shall control with the employee with the greatest industry seniority having first choice.

• SECOND -The maintenance local union shall furnish any additional qualified maintenance employees required by the Employer at such pier or terminal.

**Section 4.      Unqualified Employees**

The Employer has the right within thirty (30) days to determine if the employee is qualified. If the Employer determines that the employee is not qualified, the Employer shall notify the maintenance local union having jurisdiction over the area where the Employer's facility is located in writing, setting forth the reason(s) why the Employer has determined that the employee is not qualified.

**Section 5.      Additional Employees**

The Employer shall notify the maintenance local union having jurisdiction over the area where the Employer's facility is located if there is any work requiring more than the present complement of maintenance employees.

**Section 6.      Limited Pass Registrants**

Whenever there is a shortage in the maintenance categories covered by this Agreement, the following procedures shall take place:

**(a)** The Employer shall send the applicant who is considered to have special skills to the Waterfront Commission with a letter spelling out the desire of the Employer to hire such individual and the special skills which the individual possesses.

**(b)** The NYSA and the ILA shall continue to seek to obtain permanent Waterfront Commission registration for all limited pass, special skill registrants who have been employed under NYSA-ILA Agreements for at least five (5) years so that such employees shall be issued open passes by the Waterfront Commission, giving them the same job rights and opportunities, except for eligibility for GAI, enjoyed by NYSA-ILA maintenance mechanics who were hired prior to 1968.

**Section 7.      Effect of this Article**

Nothing in this Article shall be construed so as to affect or limit the right of Employers, subject to this Agreement, to discharge employees for cause.

**ARTICLE XVI**
**HIRING PROCEDURES**

**Section 1.      Availability for Work**

All employees shall make themselves available for work and when called by the hiring center must accept the assignments and must work. The Contract Board shall have the power without regard to any other provisions of this Agreement to enforce such procedures as shall assure that all employees are dispatched with regularity. In appropriate cases the Contract Board may require retraining for other positions in the industry, apply disciplinary procedures, or take other actions to compel the employees to make themselves available for work and to work with regularity.

**Section 2.      Hiring of Longshoremen**

**(a) Sections.** The Port of New York and New Jersey is divided into five sections:

| Section No. | Area | | |
|---|---|---|---|
| 01 | Brooklyn, New York | 07 | Manhattan, New York |

12

**(b) Telephonic Hiring System ("THS").** Work for longshoremen is assigned through the THS based on Prior Day Ordering ("PDO"). The THS is available Monday to Friday from 6:00 A.M. to 12:00 midnight, on Saturdays from 6:00 A.M. to 8:00 P.M., and on Sundays and paid holidays from 7:00 A.M. to 12:00 midnight. Ordering for a paid holiday through the next regular work day shall take place on the eve of the holiday. Direct Employers hire on a PDO basis the Employers' Regular Gangs and Regular List employees between 6:00 A.M. and 2:30 P.M. each day, Monday through Saturday.

**(c) Gang Ordering Procedures.**

**(i)** -For MONDAY -

• -Gangs wanted for 7:00 A.M., 8:00 A.M., 10:00 A.M., 1:00 P.M., or 3:00 P.M. starting times on Monday (or Tuesday, if Monday is a paid holiday) shall be ordered not later than 2:30 P.M. Saturday. The 7:00 A.M., 8:00 A.M., and 10:00 A.M. starting times are subject to cancellation not later than 7:00 A.M. Monday if the ship for which the gangs have been ordered is not at that time at the berth where the work is to be performed; in the event such orders are cancelled but such gangs are wanted for 1:00 P.M., 3:00 P.M., or 7:00 P.M. starts, they shall be given their orders not later than 7:30 A.M. that day.

• -Gangs ordered on Saturday for a 1:00 P.M. or 3:00 P.M. start on Monday shall not be subject to cancellation.

**(ii)** For TUESDAY TO SATURDAY —

• -Gangs wanted for work Tuesday to Saturday, inclusive, shall be ordered not later than 2:30 P.M. on the previous day except that gangs wanted for 7:00 P.M. and 11:00 P.M. starting times may be ordered on the same day but not later than 2:30 P.M. Monday through Saturday.

**(iii)** For SUNDAY —

• -Gangs wanted for work on Sunday shall be ordered not later than 2:30 P.M. on the previous day.

**(iv)** -If Saturday hiring is not implemented, the following ordering procedures will remain in effect:

• -Gangs wanted for work on Sunday shall be given their orders not later than 3:00 P.M. on Friday, subject to cancellation not later than 8:00 A.M. Saturday.

• -Gangs working on Saturday that are wanted for 8:00 A.M. Monday shall be given their orders before being knocked-off, subject to cancellation not later than 7:00 A.M. Monday if the ship for which the gangs have been ordered is not at that time at the berth where the work is to be performed; in the event such orders are cancelled but such gangs are wanted for 1:00 P.M. or 7:00 P.M., they shall be given their orders not later than 7:30 A.M. that day.

• -Gangs working on Saturday and ordered before being knocked-off for a 1:00 P.M. start on Monday shall not be subject to cancellation.

• -Gangs working on Saturday and needed for work on Sunday shall be so notified by 3:00 P.M. Saturday.

**(d) Telephone Calls for Orders.** Every employee is required to call the THS on weekdays between 4:00 P.M. and 8:00 P.M. for orders for that night or for next-day orders. Every employee is required to call the THS on Saturdays between 4:00 P.M. and 8:00 P.M. for orders for that night and for Sunday and Monday orders and for Tuesday orders, if Monday is a paid holiday. All calls will be recorded. The dispatchers will identify themselves by their code numbers, and the employee calling must present the employee's Waterfront Commission number and the telephone number at which the employee can be reached the next morning between 8:00 A.M. and 9:30 A.M. on Monday to Friday.

**(i)** If an employee receives no orders for the next day, the call-in will itself cause the system to automatically classify the employee as "available" for 8:00 A.M., 10:00 A.M., or 1:00 P.M. work which might arise the next weekday, except that no call-in credit for Monday will be given for the Friday-night call-in. Call-in credit for Monday will be given only for the Saturday-night call-in. If Monday is a paid holiday, call-in credit for Tuesday will be given for the Saturday-night call-in.

**(ii)** If an employee fails to call for orders, the system will automatically treat the employee as unavailable for an 8:00 A.M. work assignment arising the next day; or in the case of a failure to call in on a Saturday night, the system will automatically treat the employee as unavailable for an 8:00 A.M. work assignment arising on Monday; and if Monday is a paid holiday, then the employee will be treated as unavailable for an 8:00 A.M. work assignment arising on Tuesday.

**(e) Cancellations.** A direct Employer on any day from Monday to Saturday between 8:00 A.M. and 2:30 P.M. can cancel same-day list and gang orders for 7:00 P.M. and 11:00 P.M. starts and any orders for future days. Employees who receive PDO orders for gang fill-ins cannot be cancelled. A direct Employer on the first regular work day of the week from 6:30 A.M. to 7:00 A.M. can cancel same-day gang orders, and those individuals who are cancelled are automatically made available in the 8:00 A.M. shape pool. List and gang orders cannot be cancelled when the first regular day of the work week is not a regular work day but a paid holiday. A direct Employer can cancel 8:00 A.M. orders for Monday or the Tuesday after a Monday holiday by notification between 6:30 A.M. and 7:00 A.M. that day. A direct Employer can cancel orders for gangs for Sunday by notification no later than 8:00 A.M. on Saturday.

**(f) Availability for Work.** If an employee has no order for work, the employee can be made available for work on the next day via the nightly call-in, Monday to Thursday and Saturday. Any employee without orders who remains available in the system must be near the employee's contact telephone the next morning from 8:00 A.M. to 9:30 A.M., Monday to Friday, except on paid holidays for assignment as a fill-in for someone who fails to appear. All persons hired in the morning as fill-ins must be available for work and will be given a reasonable period of time to arrive at the work sites. If no orders are received on a Saturday call-in, the employee need not be near the employee's contact phone on Sunday or on a Monday holiday. If Monday is not a holiday, the employee must be by the employee's contact phone on Monday. In order to verify availability, sixty (60) employees selected on a random basis by the computer will be called daily between 8:00 A.M. and 9:00 A.M. by the dispatchers and Waterfront Commission personnel at the THS. The sixty will include ten (10) individuals whose names are provided by the Association because there is reason to suspect that they are not available to work. Failure to respond to these calls will result in the imposition of an "A" debit.

**(g) Voluntary Registrations.** Persons may call the THS to volunteer for work. When they call, individuals should give the dispatcher the telephone number where they can be reached, if the system does not already have that telephone number. Volunteer times are:

**(i)** **-Monday to Friday:**
9:00 A.M. to 12: 45 P.M. to volunteer for same-day 10:00 A.M., 1:00 P.M., and 3:00 P.M. starting times.

**(ii)** **-Monday to Friday:**
4:00 P.M. to 6:45 P.M. to volunteer for same-day 7:00 P.M. and 11:00 P.M. starting times.

**(iii)** **-Saturday for Saturday Work:** 7:00 A.M. to 8:00 A.M. on Saturday to volunteer for 8:00 A.M., 10:00 A.M., 1:00 P.M., 3:00 P.M. and 7:00 P.M. starting times on that Saturday.

**(iv)** **-Saturday for Sunday Work:**
7:00 A.M. to 8:00 A.M. on Saturday to volunteer for 8:00 A.M., 10:00 A.M., 1:00 P.M., 3:00 P.M., 7:00 P.M. and 11:00 P.M. Sunday starting times on Sunday.

**(v)** **-Holidays:**
7:00 A.M. to 8:00 A.M. on the holiday to volunteer for 8:00 A.M., 10:00 A.M., 1:00 P.M., 3:00 P.M., 7:00 P.M. and 11:00 P.M. starting times.

Hiring agents will call those individuals who have volunteered for a specific start time to offer them work as follows:

| Starting Time | Time of Call | | |
|---|---|---|---|
| 7:00 A.M. to 9:00 A.M. | 7:00 A.M. to 8:00 A.M. | 8:00 A.M. 10:00 A.M. | 8:00 A.M. 10:00 A.M. to 11:00 |
| A.M. | 1:00 P.M. | 1:00 P.M. to 2:00 P.M. | |
| 3:00 P.M. to 8:00 P.M. Midnight | 3:00 P.M. to 4:00 P.M. | 7:00 P.M. 11:00 P.M. | 7:00 P.M. 11:00 P.M. to 12:00 |

The individual is not required to accept the job. There is no penalty for not accepting this job, but there is a penalty for accepting it and then not showing up. Hiring agents shall adhere to all hiring criteria, including seniority and skills, when determining whom to call with a job offer.

**(h)  Removal From System.** An employee is required to be available for work seven (7) days a week. However, an employee on a regular gang or list position can be removed from the hiring system at the employee's request by obtaining the consent of the direct Employer with which the employee has a list position, if the direct Employer has sufficient workers with the necessary skills to meet its needs for the period of that employee's unavailability. An employee who does not have a list position or is on an employer-sponsored list can be removed from the hiring system by obtaining the consent of the NYSA-ILA GAI Fund if there are sufficient workers with necessary skills to meet the needs of the Port for the period of the employee's unavailability.

**(i)  Unavailable Gangs.** Members of gangs ordered for 7:00 P.M. and 11:00 P.M. starting times, Monday through Sunday, shall not be available for PDO the following day. When they call between 4:00 P.M. and 8:00 P.M. for orders, they can make themselves available for the next day's 8:00 A.M. fill-in hiring. Members of gangs ordered for 7:00 P.M. and 11:00 P.M. starting times on Saturday shall not be available for PDO for Sunday but are available for Monday.

**(j)  Hiring-Section Sequence.** During PDO hiring and same day fill-in hiring, a direct Employer must fill its gang and terminal needs from its regular gangs, from its regular ship drivers' list, from its regular field drivers' list, and from its regular terminal lists. When all of a direct Employer's list employees have been exhausted, the direct Employer must fill its needs from within the section where the Employer's facility is located based upon section seniority and necessary skills. Within each alpha-seniority classification in the section, the direct Employer may hire first employees on the Employer's sponsored list in that alpha-seniority classification. The Employer must then exhaust every employee who is eligible in the section in that alpha-seniority classification before the Employer can hire employees on the Employer's sponsored list in the next lower alpha-seniority classification. If the Employer has exhausted all eligible employees within the section and on the Employer's sponsored list, the Employer may then hire from other sections. There is a sequence of sections that must be followed depending upon the section where the Employer's facility is located:

| Employer's Section | Sequence of Sections |
|---|---|
| Section 01 (Brooklyn) and 12 in that order | -Sections 16, 07, 14, |
| Section 07 (Manhattan) and 12 in that order | -Sections 01, 16, 14, |
| Section 16 (Staten Island) and 12 in that order | -Sections 01, 07, 14, |
| Section 14 (Hudson County) and 16 in that order | -Sections 12, 07, 01, |
| Section 12 (Newark/Elizabeth) and 16 in that order | -Sections 14, 07, 01, |

The Employer must exhaust all eligible employees within a section before going to the next section in the sequence.

**(k)  Hiring-Seniority Sequence.**

**(i)  Within the Employer's Section.** During PDO hiring and same-day fill-in hiring, once the direct Employer's Regular List Employees have been exhausted, the hiring in the direct Employer's section must proceed as follows:

**Level 1** - Employees in Seniority Classifications A through H who are GAI-eligible and qualified have first preference.

**Level 2** - Employees in Seniority Classifica-tions A through J who are not GAI-eligible and qualified have second preference.

**-Level 3** - Employees in Seniority Classifica-tions K through R have third preference.

**-Level 4** - Employees in Seniority Classifica-tion R have fourth preference.

**-Level 3** - Employees in Seniority Classifica-tion S have fifth preference.

**-Level 4** - Employees in Seniority Classifica-tion S have sixth preference, but Level 4 employees have first preference for assignments to work on carships for their employer-sponsors when the hiring reaches their alpha-seniority classification.

Before filling hold positions in the hiring process all equipment operator needs must be satisfied first. Priority in hiring within each level is determined by alpha-seniority designations with the "A" seniority employees having priority in hiring over "B" seniority employees and "B" seniority employees having priority over "C" seniority employees, and so on down the alphabet. However, within an alpha-seniority classification there is no preference based on length of service or date of Waterfront Commission registration. An Employer can hire any employee within an alpha-seniority classification, provided the employee has the skill certification required.

(ii) **Other Sections**. If the Employer has exhausted all eligible employees within the Employer's section, the Employer may then hire from other sections in accordance with the sequence of sections set forth in Section 2(j) of this Article. In each section the hiring shall be conducted in accordance with the procedures set forth in Section 2(k)(i) of this Article XVI.

(l) **Criteria for Selection**. Two criteria control the selection process: seniority and skill certification. The other criteria which may influence an Employer's selection are "flexibility" and "productivity." An Employer has a right to assign work to those who are qualified by skill certification to perform it, meaning that a less senior worker may be selected because the less senior employee is qualified to operate a more complex piece of equipment. When an employee is certified to operate the more complex equipment but the employee's productivity is below the norm, the Employer must document that fact, inform the employee of the factual basis for that determination, and afford reasonable additional training to increase productivity. If the employee's productivity does not improve, the Employer has the right to select a more productive operator with less seniority.

(m) **Completion of Assignment**. If an employee begins a work assignment, the employee must complete that assignment except in the following instances:

(i) If an employee works past midnight on a ship, the employee need not report for an 8:00 A.M. order the next day, unless the employee volunteered for the past-midnight work assignment or failed to advise the Employer with which the employee has a list or gang position that the employee is working past midnight and should be taken out of the system. An employee who works past midnight on a ship must resume work on the same ship at 8:00 A.M. after a break, unless the employee notified the Employer in a timely fashion of the employee's intent not to work, so that a replacement could be found in time.

(ii) An employee who starts a ship at 7:00 A.M. or 8:00 A.M. can ask for a replacement at 5:00 P.M. If, however, the replacement fails to appear at 5:00 P.M., the employee working the ship must remain on that job until the replacement actually appears or the job is otherwise finished. The same rule for replacements applies to 10:00 A.M., 1:00 P.M., 3:00 P.M., and 7:00 P.M. starting times, but replacements are not permitted for an 11:00 P.M. starting time. Any employee accepting 11:00 P.M. orders must appear and complete the assignment.

(n) **Open-Berth Hiring**. Notwithstanding the provisions of Article XVI, Section 2 that are applicable to a direct Employer's hiring of employees for work at its facility, when all of a direct Employer's regular list employees at an open berth have been exhausted, the direct Employer shall have the right to fill its needs from its regular lists from other piers within the section where the open berth is located before hiring employees on a PDO basis.

**Section 3.     Categories for Longshoremen**

The primary longshoremen categories are: (i) Hold, (ii) Ship Labor, and (iii) Terminal Labor. All new longshoremen entering the industry shall be assigned to the Terminal Labor category. Secondary categories, including but not limited to crane operator ("OC"), driver ("DR"), hustler driver ("DH"), straddle carrier operator ("SC"), etc., now used in the hiring system shall remain in effect. Secondary categories are based on the employees' certified skills to operate container handling equipment. The placement of longshoremen in such secondary categories shall continue, and there shall be no change in any employee's primary category for the duration of this Agreement.

**Section 4.     -Hiring of Clerks, Checkers and Timekeepers**

(a) **Telephonic Hiring System ("THS")**. Work for clerks, checkers, and timekeepers is assigned through the THS based on Prior Day Ordering ("PDO"). The THS is available Monday to Friday from 6:00 A.M. to 12:00 Midnight, on Saturdays from 6:00 A.M. to 8:00 P.M., and on Sundays and paid holidays from 7:00 A.M. to 12:00 Midnight. Ordering for a paid holiday through

the next regular work day shall take place on the eve of the holiday. Direct Employers hire on a PDO basis the Employers' Regular List Employees between 6:00 A.M. and 2:30 P.M. each day, Monday through Saturday.

(b) **Telephone Calls for Orders.** Every employee is required to call the THS on weekdays between 4:00 P.M. and 8:00 P.M. for orders for that night or for next-day orders. Every employee is required to call the THS on Saturdays between 4:00 P.M. and 8:00 P.M. for orders for that night and for Sunday and Monday orders and for Tuesday orders, if Monday is a paid holiday. All calls will be recorded. The dispatchers will identify themselves by their code numbers, and the employee calling must present the employee's Waterfront Commission number and the telephone number at which the employee can be reached the next morning between 8:00 A.M. and 9:30 A.M. on Monday to Friday.

(i) If an employee receives no orders for the next day, the call-in will itself cause the system to automatically classify the employee as "available" for 8:00 A.M., 10:00 A.M., or 1:00 P.M. work which might arise the next weekday, except that no call-in credit for Monday will be given for the Friday-night call-in. Call-in credit for Monday will be given only for the Saturday-night call-in. If Monday is a paid holiday, the call-in credit for Tuesday will be given for the Saturday-night call-in.

(ii) If an employee fails to call for orders, the system will automatically treat the employee as unavailable for an 8:00 A.M. work assignment arising the next day; or in the case of a failure to call in on a Saturday night, the system will automatically treat the employee as unavailable for an 8:00 A.M. work assignment arising on Monday; and if Monday is a paid holiday, then the employee will be treated as unavailable for an 8:00 A.M. work assignment arising on Tuesday.

(c) **Cancellations.** A direct Employer on any day from Monday to Saturday between 8:00 A.M. and 2:30 P.M. can cancel same-day orders for 7:00 P.M. and 11:00 P.M. starts and any orders for future days.

(d) **Availability for Work.** If an employee has no order for work, the employee will be made available for work on the next day via the nightly call-in, Monday to Thursday and Saturday. Any employee without orders who remains available in the system must be near the employee's contact telephone the next morning from 8:00 A.M. to 9:30 A.M., Monday to Friday, except on paid holidays for assignment as a fill-in for someone who fails to appear. All persons hired in the morning as fill-ins must be available for work and will be given a reasonable period of time to arrive at the work sites. If no orders are received on a Saturday call-in, the employee need not be near the employee's contact phone on Sunday or on a Monday holiday. If Monday is not a holiday, the employee must be by the employee's contact phone on Monday. In order to verify availability, sixty (60) employees selected on a random basis by the computer will be called daily between 8:00 A.M. and 9:00 A.M. by the dispatchers and Waterfront Commission personnel at the THS. The sixty will include ten (10) individuals whose names are provided by the Association because there is reason to suspect that they are not available to work. Failure to respond to these calls will result in the imposition of an "A" debit.

(e) **Volunteering for Work Assignments.** Clerks and checks may call the THS to volunteer for work as follows:

(i) For work on weekends and Monday holidays, the employee must call the dispatcher at the THS between the hours of 9:00 A.M. and 11:00 A.M. on Fridays; and

(ii) For work on a paid holiday (other than a Monday holiday), the employee must call the dispatcher at the THS between the hours of 9:00 A.M. and 11:00 A.M. on the day before the holiday.

(f) **Removal From System.** An employee is required to be available for work seven (7) days a week. However, an employee in a Regular List Position can be removed from the hiring system at the employee's request by obtaining the consent of the direct Employer with which the employee has a list position, if the direct Employer has sufficient workers with the necessary skills to meet its needs for the period of that employee's unavailability. An employee who does not have a list position or is on an employer-sponsored list can be removed from the hiring system by obtaining the consent of the NYSA-ILA GAI Fund, if there are sufficient workers with necessary skills to meet the needs of the Port for the period of the employee's unavailability.

(g) **Criteria for Selection.** Two criteria control the selection process: seniority and skill certification. When additional checkers other than Regular List Employees are needed as extras, they

shall be chosen on a portwide basis from available extra employees on the basis of their alpha-seniority classification. The other criteria which may influence an Employer's selection are "flexibility" and "productivity." An Employer has a right to assign work to those who are qualified by skill certification to perform it, meaning that a less senior worker may be selected because the less senior employee is qualified to operate a more complex piece of equipment. When an employee is certified to operate the more complex equipment but the employee's productivity is below the norm, the Employer must document that fact, inform the employee of the factual basis for that determination, and afford reasonable additional training to increase productivity. If the employee's productivity does not improve, the Employer has the right to select a more productive operator with less seniority.

**(h) Completion of Assignment.** If an employee begins a work assignment, the employee must complete that assignment except in the following instances:

**(i)** If an employee works past midnight on a ship, the employee need not report for an 8:00 A.M. order the next day, unless the employee volunteered for the past-midnight work assignment or failed to advise the Employer with which the employee has a list position that the employee is working past midnight and should be taken out of the system. An employee who works past midnight on a ship must resume work on the same ship at 8:00 A.M. after a break, unless the employee notified the Employer in a timely fashion of the employee's intent not to work, so that a replacement could be found in time.

**(ii)** An employee who starts a ship at 7:00 A.M. or 8:00 A.M. can ask for a replacement at 5:00 P.M. If, however, the replacement fails to appear at 5:00 P.M., the employee working the ship must remain on that job until the replacement actually appears or the job is otherwise finished. The same rule for replacements applies to 10:00 A.M., 1:00 P.M, 3:00 P.M., and 7:00 P.M. starting times, but replacements are not permitted for an 11:00 P.M. starting time. Any employee accepting 11:00 P.M. orders must appear and complete the assignment.

## Section 5. Hiring of Maintenance Employees

**(a) Regular Maintenance Employees**. Maintenance employees employed by one Employer shall receive their orders through channels to be established between the Employer and the employee. No maintenance employee shall be shaped at the place of employment.

**(b) Extra Maintenance Employees.** For work from Monday to Friday inclusive between the hours of 8:00 A.M. and 5:00 P.M., maintenance employees shall receive their orders between 7:30 A.M. and 8:00 A.M. Maintenance employees ordered for night work Monday to Friday inclusive:

**(i)** for a 5:00 P.M. or later start shall be given their orders not later than 3:00 P.M. of the day to be worked;

**(ii)** for work on Saturday for an 8:00 A.M. or 1:00 P.M. start shall receive their orders not later than 3:00 P.M. Friday;

**(iii)** for night work on Saturday or work on Sunday shall receive their orders through established channels;

**(iv)** for work on paid holidays shall receive their orders by 4:00 P.M. of the previous day, except when a holiday falls on Monday, in which event they shall receive their orders through established channels;

**(v)** the Employer shall have free choice of the maintenance employees to be employed;

**(vi)** maintenance employees who are working on the premises on the previous day shall receive their orders before knocking off; and

**(vii)** in the event that maintenance employees fail to report at the hour they are ordered for work, the employer may hire sufficient other maintenance employees to replace those who fail to appear.

## Section 6. Absentee Procedures

The Absentee Procedures shall be strictly applied to any worker who fails to report to work as ordered or who fails to remain at work for the duration of the worker's assignment, whether as a member of a gang or on a list or as an individual. The Absentee Procedures of September 2003 shall be effective through January 2, 2005. The Absentee Procedures of December 2004 shall be effective from January 3, 2005, until September 30, 2010, except to the extent they may be modified by the Contract Board. These Absentee Procedures are appended to this Agreement as Annex E.

## ARTICLE XVII
### TRAINING

**Section 1.    NYSA-ILA Driver Training Program**

The NYSA-ILA Driver Training Program has been established. All employees must report for such training and upon being trained shall report for all driving assignments offered to them.

**Section 2.    Mandatory Training**

All employees shall be required to undergo mandatory training for all container handling equipment. Failure or refusal to undergo training will result in disciplinary action.

## ARTICLE XVIII
### INCOME GUARANTEE

**Section 1.    Control of GAI Costs**

The NYSA-ILA Contract Board shall be responsible for managing the GAI program strictly and effectively in accordance with its terms and for making every effort to maintain the present rate of assessment attributable to the costs of the GAI Program and eventually to reduce it. The Contract Board shall have full authority to promulgate such GAI rule changes as shall control GAI costs. The GAI Agreement and Declaration of Trust and Plan shall be amended to continue to protect its tax-exempt status and exemption from the FICA and FUTA requirements of the Internal Revenue Code.

**Section 2.    Filling Vacancies**

The Contract Board shall maintain the seniority lists for all waterfront terminals. All GAI-eligible employees shall be drafted to fill any and all vacancies existing in the Port. Such drafts of GAI-eligible employees shall be held on a regular basis. Employers shall submit schedules of list vacancies to be filled to each area subcommittee, which shall promptly fill the vacancies from GAI-eligible employees first in the area, then in the zone and, finally, on a portwide basis. In the event the area subcommittee for any reason fails to fill all vacancies (in accordance with such procedures as have been determined by the Contract Board), the Contract Board, upon notice from either party, shall fill the remaining vacancies promptly. In the event that there are any remaining vacancies after review by the Contract Board and there are eligible GAI employees anywhere in the Port who are not assigned to lists, the Employers may seek immediate arbitration in accordance with this Agreement with respect to the assignment of those employees.

**Section 3.    GAI Payments**

Payments of GAI shall be made on an annual basis within a reasonable time after the end of the contract year. However, at the end of each of the first three quarters of the contract year, each qualified employee shall be paid up to 75% of so much of the amount of the guarantee cumulatively due the employee as of the end of such quarter. Final settlement will be made within a reasonable time after the end of the last quarter. Advances of the amount cumulatively due will be made every two (2) weeks (except for the last period in a quarter which shall be in advance for a three (3) week period). Accountings shall be made every quarter, but in no event shall any employee who receives payments from wages, vacation, holiday, GAI, unemployment or Workers' Compensation for 1,900 hours or more multiplied by the applicable basic straight time hourly wage rate in any contract year receive any additional GAI payments. This guarantee is subject to the procedures regulating hiring and GAI set forth in this Agreement and in the Agreement and Declaration of Trust and Plan of the NYSA-ILA GAI Fund, as amended and restated on November 30, 2000 and in the GAI Fund's Summary Plan Description dated May 2001. GAI payments shall be included in determining eligibility for vacation, holiday, pension, and welfare benefits.

**Section 4.    Ineligibility for GAI**

Employees who are ineligible for GAI as of September 30, 2004, shall continue to be ineligible for at least a full twelve (12) month period from the date of their ineligibility. Any such ineligible employee shall be available only for assignment at the morning hiring or for PDO assignment on a portwide basis after all GAI recipients have been hired.

## ARTICLE XIX

DRUG AND ALCOHOL ABUSE PROGRAM

In accordance with the Master Contract, the NYSA and the ILA have adopted a drug and alcohol abuse program. The terms and conditions of the program are set forth in the NYSA-ILA Port of New York and New Jersey Plan for Implementation of the Master Contract Drug and Alcohol Abuse Program, as amended and restated in December 2000, a copy of which is appended to this Agreement as Annex F.

## ARTICLE XX
### SAFETY

**Section 1.    Personal Protective Equipment**
When rubber boots are required for handling wet cargo or explosives or leather handpads or gloves are required for handling barbed wire, they shall be provided by the Employer.

**Section 2.    Replacing Hatch Covers**
Gangs shall be knocked off at a reasonable time but not less than ten (10) minutes before quitting time to replace hatch covers. Under no circumstances shall employees leave a ship or fail to return if ordered back without replacing hatch covers, and the Employer may discipline any employee guilty of a violation of this rule as the Employer sees fit or as circumstances may require.

**Section 3.    Raingear**
Suitable shelter or raingear shall be provided for employees working on decks in bad weather. Other employees exposed to the elements shall be provided with suitable shelter or raingear in bad weather.

**Section 4.    Amenities**
The Employers shall supply proper drinking water on the pier, first aid equipment, and adequate and clean toilet facilities. Where maintenance employees are employed steadily at a fixed place of work, facilities for safeguarding of their tools are to be made available.

**Section 5.    Refrigerated Cargo**
When refrigerated cargo is to be worked, the employees shall be notified of that fact the previous day so that they may wear suitable clothing.

**Section 6.    Chemicals**
Only chemicals that are properly packed and in proper shipping condition are to be accepted or loaded on board ship. If any question arises regarding the condition of this class of cargo, the matter shall be left to the proper governmental authority whose decision shall be final.

**Section 7.    Maintenance Work in the Hold**
When maintenance work covered by this Agreement is to be performed in the hold of a ship, at least two maintenance employees shall be employed, unless longshoremen are working at the same time in the same compartment in the hold.

**Section 8.    NYSA-ILA Joint Safety Committee**
**(a) Formation.** The parties have established the NYSA-ILA Joint Safety Committee consisting of an equal number of representatives of both parties to function for the duration of this Agreement. The NYSA-ILA Joint Safety Committee shall meet regularly but not less frequently than bi-monthly.
**(b) Safety Code.** The Joint Safety Committee shall update as necessary the NYSA-ILA Joint Maritime Safety Code to comply with all existing provisions of applicable federal, state and local laws.
**(c) Safety Manual.** The Joint Safety Committee shall prepare a safety manual applicable to ship, pier, and terminal operations for the guidance of all concerned. The Joint Safety Committee shall promote and supervise a regular, continuing educational campaign of safety consciousness, which shall be addressed both to supervisory personnel and to employees covered by this Agreement.
**(d) Qualified Experts.** The Joint Safety Committee shall utilize the services of qualified safety experts in order to put into operation and further its safety program.

(e) **Safety Grievances.** The Joint Safety Committee shall establish machinery under which potential hazards or unsafe practices can be settled immediately at the pier level and under which differences as to alleged potential hazards or unsafe practices can be settled immediately at the pier level among union representatives, including the shop steward, management supervisors and NYSA representatives. Should no such settlement be reached, the matter shall be referred to the Joint Safety Committee for decision, and the Committee shall be empowered to engage such technical assistance as it deems necessary to assist it in reaching a decision. The cost of such technical assistance shall be borne equally by the parties. If the members of the Joint Safety Committee cannot agree, or if either the Union or the Employer refuses to accept the decision of the Committee on any dispute referred to it, the matter shall be referred to the Contract Board for hearing and final determination. The Contract Board shall be empowered to engage such technical assistance as it deems necessary to assist it in reaching a decision. The cost of such technical assistance shall be borne equally by the parties.

(f) **Injury Repeaters Program.** The Joint Safety Committee shall institute an injury repeaters' program and a medical qualification program determining capability to perform work through medical examinations for such persons as well as for all operators of machinery and equipment. The Committee shall establish the policy to apply to all persons who do not have the capability to perform the work.

(g) **Safety Violation Program**. The NYSA-ILA Joint Safety Violations Program shall be made part of this Agreement. This Program is annexed hereto as Annex G.

## ARTICLE XXI
### PROHIBITED CONDUCT

**Section 1.      Alcohol and Drugs**

Employees are prohibited from bringing beer or other intoxicating beverages or illegal drugs onto the pier or marine terminal facility. In the event of a violation of this provision, the employee shall be disciplined in accordance with the terms of the NYSA-ILA Port of New York and New Jersey Plan for Implementation of the Master Contract Drug and Alcohol Abuse Program.

**Section 2.      Smoking**

There shall be no smoking in the cargo spaces of the ship or on decks, near open hatches, or on the pier or marine terminal facility (except in designated smoking areas). For a violation of this provision, the guilty person shall be discharged and given no further employment by the Employer. The Union recognizes the danger of this offense and shall cooperate in every way to eliminate it.

**Section 3.      Presence on the Pier**

No employee is allowed to leave the pier during working hours without the express permission of the Foreman Stevedore in charge.

**Section 4.      -Incompetency, Shirking of Work, and Theft**

Incompetency, shirking of work, and pilfering and broaching of cargo are prohibited. Any employee found guilty of these offenses shall be dealt with as the Employer sees fit or as the circumstances may require. If any employee is convicted of theft in the course of employment, the employee shall be discharged from any further employment in the industry.

**Section 5.      Discipline**

Whenever an employee is discharged by an Employer for violating any provision of this Agreement, the employee shall be suspended from all further employment in the industry. Such an employee shall have the right to grieve the matter under the Grievance Procedure. At any time within three (3) months after such suspension, the employee may apply to the Labor Relations Committee for reinstatement to industry employment with other employers. The Labor Relations Committee shall have the power to reinstate the employee after the employee has been suspended for six (6) months on such terms as it considers proper or it may continue the suspension for an additional period or deny the application.

## ARTICLE XXII

ANTI-HARASSMENT AND
ANTI-DISCRIMINATION POLICY

The NYSA and the ILA have adopted a joint anti-discrimination and anti-harassment policy for employees covered by this Agreement. This policy against discrimination, harassment and retaliation, which is entitled "Respect and Dignity in the Maritime Industry Workplace," is appended to this Agreement as Annex H.

## ARTICLE XXIII
### MANAGEMENT RIGHTS

**Section 1.    Management Rights**
Every Employer covered by this Agreement retains its right to manage its operations in the manner it deems desirable.

**Section 2.    Change of Operation**
In the event of a major change in operation, however, the Employer will, where possible, give the Union advance information as to the nature of the change. Should, however, objection to such change be made by the Union, the work shall continue pending disposition of the matter under the Grievance Procedure of this Agreement. In the event the change in operation involves the introduction of new technology, then the new technology provisions of the Master Contract shall control.

## ARTICLE XXIV
### PROHIBITION OF LOCKOUTS, STRIKES, AND WORK STOPPAGES

During the term of this Agreement there shall be no lockouts by the Employers, but this shall not be construed to mean a layoff of employees due to business conditions. The Union agrees that there shall be no strikes or work stoppages by the employees. The right of employees not to cross a bona fide picket line is recognized by the Employers.

## ARTICLE XXV
### GRIEVANCE AND ARBITRATION

**Section 1.    Scope**
Any grievance, dispute, complaint, or claim arising out of or relating to this Agreement shall be handled and disposed of in the manner hereinafter provided in this Article, and all of the parties hereto shall be bound by any decisions made in accordance therewith. A grievance under this Agreement must be brought within one hundred eighty (180) days of the date the grievance first arises.

**Section 2.    -THE FIRST STEP - Supervisor/Shop Steward**
When a grievance or dispute occurs, either the management representative (stevedore foreman, pier superintendent, or appropriate designee of the Employer) or the Union shop steward shall immediately call the problem to the attention of the other party. Work shall continue in the interim. Each party shall use good judgment and make every effort to arrive at a settlement consistent with this Agreement.

**Section 3.    -THE SECOND STEP - Labor Adjusters**
(a) Should there fail to be settlement at the first step, it shall be the obligation of both parties to call immediately for an ILA delegate, the ILA Labor Adjuster, and the NYSA Labor Adjuster to come at once to the pier where the dispute took place. The NYSA and the ILA shall each name a paid, full-time labor adjuster for the purpose of settling disputes promptly at pier level.
(b) Should there be a resolution at pier level, the resolution reached shall be reported to the Labor Relations Committee (ALRC") (referred to in the Third Step) for its information. All resolutions at this second step as to rates of pay on dirty cargo shall be final and binding and not

subject to review but shall be reported to the LRC. An aggrieved party may appeal any other resolution by the Labor Adjusters. In the event the grievance or dispute relates to the interpretation or application of any provision of this Agreement, the resolution reached shall be subject to review and revision by the LRC to assure its conformance with the provisions of this Agreement. Such review shall not include a reconsideration of the facts as established in connection with the resolution reached. In the event the LRC determines that the resolution reached relates to the interpretation or application of a provision of this Agreement, it may either affirm or revise the resolution reached or either party may submit the matter to arbitration. An appeal from a determination of the NYSA-ILA Labor Adjusters must be brought within ninety (90) days from the date of the Labor Adjusters' Report. The party appealing a determination of the Labor Adjusters may appear before the LRC concerning the appeal, with or without legal counsel or a duly authorized representative, provided the right to appear is requested in writing at the time the appeal is filed.

(c) Where resolution cannot be reached at pier level and where in the opinion of the ILA delegate and the two Labor Adjusters the disagreement is of such a nature as to seriously impair good relations, either side may ask for immediate arbitration with only the concurrence of the Chairman of that side of the LRC. Should arbitration not be required but the matter is one that may be resolved by further discussions but cannot be agreed upon by the ILA delegate and the two Labor Adjusters, such matter shall be referred to the LRC.

**Section 4.     THE THIRD STEP - LRC**

(a) There shall be established a joint NYSA-ILA Labor Relations Committee consisting of representatives of the Employers and representatives of the Union. The LRC shall meet periodically on a stated day and at a stated time and shall be in general charge of the Grievance Procedure and the day-to-day relations between the ILA and the NYSA. The LRC shall not only discuss and dispose of all disputes referred to it on the basis of merit but also shall have the power and authority to refer any and all matters under disagreement to the Contract Board in the event of final disagreement and upon motion of either side.

(b) Failure of the other side to attend an LRC meeting shall not prevent the meeting from proceeding. However, following prior-day telephonic, facsimile or telegraphic notice, any actions taken by the side in attendance shall be deemed to have been voted against by the absent party, resulting in a deadlock.

(c) The LRC shall have the authority to review generally the relations between the parties and to make suggestions and recommendations for bettering such relations. The LRC shall also have the authority to recommend changes for the next contract opening which are in the interest of clarity, better operations, and production. The LRC shall also use its best efforts, wherever possible, to prevent disputes from arising and shall exert every effort toward fair, equitable, and reasonable relations.

**Section 5.     -THE FOURTH STEP - NYSA-ILA Contract Board**

(a) Deadlocked votes of the LRC or of any joint labor-management committee or trust fund shall be submitted to the NYSA-ILA Contract Board for resolution. An appeal from a determination of the LRC which was required to resolve a deadlock of the Labor Adjusters must be brought within thirty (30) days of the date of the notice that that Committee had deadlocked. In the absence of a deadlocked vote of the LRC, the determination of that Committee shall be final and binding, shall constitute an enforceable arbitration award, and no further appeal shall be permitted.

(b) Decisions by the Contract Board are final and binding and shall constitute enforceable arbitration awards. No further reconsideration of a determination by the Contract Board shall be permitted in the absence of new and substantial evidence requiring further consideration. Such new and substantial evidence must be submitted to the Board in writing at the time of the request for reconsideration. The Board in its sole discretion shall determine if a personal appearance is necessary, if it determines that new and substantial evidence has been submitted. In the event of a deadlock of the Contract Board, the matter shall be submitted to arbitration.

**Section 6.     THE FIFTH STEP - Arbitration**

(a) The parties shall agree on five (5) arbitrators to serve as a panel of arbitrators to hear and determine disputes. The panel shall be immediately available to the parties upon telephonic, facsimile, or telegraphic request whenever immediate arbitration is requested by either party. The

parties shall agree upon the five (5) arbitrators within thirty (30) days after execution of this Agreement, and in the event they are unable to agree upon such selection, the arbitrators shall be designated under the rules of the American Arbitration Association within thirty (30) days thereafter. Pending the designation of the panel either by the parties or pursuant to the rules of the American Arbitration Association, the arbitrators under the prior contract shall continue to constitute the panel.

**(b)** Either party may with respect to any grievance, dispute, complaint or claim arising out of or relating to this Agreement at any point waive any and all preliminary steps of the Grievance Procedure and submit the matter to arbitration ("expedited arbitration") at any time after a matter has been considered by the NYSA-ILA Contract Board. Such request shall be made in writing by the President of the ILA or the President of the NYSA, or their designees. Such writing may be by telegram, facsimile, or a letter hand-delivered to the office of the other party. Telephonic, facsimile, or telegraphic notice shall be given at the same time to a member of the panel who shall immediately thereafter (and not later than twenty-four (24) hours after receipt of such notice) convene an arbitration hearing at such place as the arbitrator shall determine, including the workplace where the dispute arose.

**(c)** In the event any party fails to appear at any arbitration, including an expedited arbitration hearing, the party failing to appear shall be deemed to have waived its right to contest its non-participation, and the arbitrator shall proceed forthwith to determine the issue.

**(d)** In an expedited arbitration the arbitrator shall issue a short-form award at the end of the hearing, unless the time to render an award is extended by mutual consent. The arbitrator shall have the right to issue a more detailed decision within thirty (30) days after the rendition of such short-form award, setting forth the reasons for the award. As to all other arbitrations, the arbitrator shall issue the award as expeditiously as possible. If an award is not rendered within thirty (30) days (unless both parties agree to extend such time period), either party shall have the right to terminate the services of that arbitrator, who shall be replaced in accordance with the procedures set forth herein. If the arbitrator is physically or mentally unable to perform the duties of an arbitrator and is thereby prevented from rendering a decision within thirty (30) days or, if the arbitrator fails to render a decision within thirty (30) days, the parties shall refer the record and briefs to the next arbitrator for decision, unless either party objects to such procedure, in which event a new and expedited hearing shall be held.

### Section 7. Powers of the Arbitrator

The arbitrator shall be called upon only as heretofore provided. The arbitrator shall adjudicate all matters presented at arbitration on the basis of fact and customs and practices in effect but shall at no time consider bona fide a custom or practice which is instituted through a job action, strike or other unilateral action after the execution of this Agreement or which is in conflict with this Agreement. The parties shall bear equally the expenses of the arbitration procedure and of all other agreed-upon expenses incurred in connection with the arbitration.

### Section 8. Interpretation of the Agreement

No carrier, marine terminal operator, contracting stevedore, or maintenance contractor and no official, district, council, or local union of the International Longshoremen's Association, AFL-CIO shall make any change in this Agreement nor render any interpretation of any provision thereof which shall be binding on any of the parties hereto. A difference of opinion regarding the meaning of any provision of this Agreement which cannot be adjusted amicably between the parties shall be dealt with in accordance with the Grievance Procedure set forth in this Article.

### Section 9. Customs and Practices

Existing customs or practices shall continue in effect except where they are contrary to specific provisions of this Agreement or where the working conditions and circumstances out of which the customs or practices arose are changed or eliminated

### Section 10. Master Contract Grievances

Grievances arising under the Master Contract shall be handled in accordance with the provisions of Article XIII of the Master Contract.

**ARTICLE XXVI**

TERM OF AGREEMENT

This Agreement together with all prior arbitration decisions and all prior determinations of the various NYSA-ILA committees and boards, including the NYSA-ILA Labor Relations Committee and the NYSA-ILA Contract Board, that are not in conflict with the provisions of this Agreement, shall be effective from October 1, 2004 through and including September 30, 2010.

## ARTICLE XXVII
### SIGNATORIES

**Section 1.      Execution of Agreement**

This Agreement has been executed by the ILA for and on behalf of itself and its affiliated local unions in the Port of New York and New Jersey and by the NYSA for and on behalf of its employer-members. Every contracting stevedore, marine terminal operator, carrier, maintenance contractor, and other person who directly or indirectly utilizes the services of any employees covered by this Agreement that is not a member of the NYSA shall by subscribing to this Agreement bind itself and its successors to each and every term and condition of this Agreement and of the Master Contract, including without limitation the payment of contributions and assessments required by the NYSA-ILA Assessment Agreement and the payment of royalties, tonnage assessments, and fringe benefits required to be paid by the terms of this Agreement and the Master Contract.

**Section 2.      Refusal to Work**

If any carrier does not subscribe to this Agreement, the ILA shall have the right not to work on the loading and discharging of such carrier's ships or any work ancillary thereto. If any employer of employees covered by this Agreement does not subscribe to this Agreement, the ILA shall have the right not to engage in any work for such employer at any facilities operated by such employer.

**Section 3.      Complete Agreement**

By their execution of this Agreement, incorporating the Master Contract and the Annexes appended hereto, the parties hereto agree that all outstanding issues between them relating to all crafts have been completely settled in accordance with the terms and provisions of this Agreement.

## ARTICLE XXVIII
### MISCELLANEOUS

**Section 1.      Headings**

The article and section headings contained in this Agreement are inserted for convenience only and shall not affect in any way the meaning or interpretation of this Agreement.

**Section 2.      Gender Neutral Language**

While gender neutral language has generally been used herein to describe job functions, any masculine terms that may appear do not imply that the worker performing the job must be male. The terms merely reflect familiar industry usage.

**Section 3.      Severability**

Should any provision of this Agreement or any trust agreement created hereunder be voided or otherwise held to be unenforceable by a tribunal of any kind, then the NYSA and the ILA shall immediately meet for the purpose of substituting provisions designed to accomplish the same purposes. Any disagreement under this provision shall be arbitrable in accordance with this Agreement. Neither the parties' failure to reach an agreement on a substitute provision nor the voiding or unforceability of any term or provision of this Agreement shall impair or affect any other term or provision of this Agreement.

**Section 4.      Ratification**

This Agreement settles all issues between the parties and has been ratified by the members of the NYSA and by the members of the ILA.

**Section 5.      Changes**

Changes to this Agreement, whether by additions, waivers, deletions, amendments, or modifications, must be mutually agreed upon in writing and either signed by both parties or incorporated into resolutions of the NYSA-ILA Contract Board that have been ratified by the Board of Directors of the NYSA and by the Executive Committee of the ILA in accordance with the provisions of Article X of this Agreement.

**IN WITNESS WHEREOF**, the parties hereto have executed this Agreement on the 18th day of October, 2005.

| NEW YORK SHIPPING ASSOCIATION, INC. | INTERNATIONAL LONGSHOREMEN'S ASSOCIATION, AFL-CIO |
|---|---|

By: S/ Frank M. McDonough, Esq.  By: S/ John Bowers
Frank M. McDonough, Esq.  John Bowers
President  President

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF RICHMOND

----------------------------------------------------------------------X

In the Matter of

WILLIAM CALDARERA,

                                  Petitioner,

            -against-

NEW YORK SHIPPING ASSOCIATION and APM
TERMINALS LLC,

                                Respondents,

Pursuant to CPLR Article 75.

  ----------------------------------------------------------------------X

Index No. 85061/2026

**AMENDED NOTICE
OF PETITION**

TO THE RESPONDENTS:

     Upon the Amended Verified Petition, verified on March 30, 2026, Petitioner, pursuant to

CPLR Article 75, shall move this Court on April 30, 2026, at 9:30 a.m., at Richmond County

Supreme Court's General Clerk's Office/Motion Support Office, Room 131, at 26 Central Avenue,

Staten Island, N.Y. 10301, for an order vacating the NYSA-ILA Contract Board's arbitration

award dated December 15, 2025 addressed to the Grievance of William Calderera against

Respondent APM Terminals LLC.

Dated: New York, New York
        March 30, 2026

                                     ADVOCATES FOR JUSTICE,
                                     CHARTERED ATTORNEYS
                                     Attorneys for Petitioner

                                     By: *Arthur Z. Schwartz*
                                      Arthur Z. Schwartz, Esq
                                    225 Broadway, Suite 1902
                                    New York, New York 10007
                                    (212) 285-1400 office
                                    aschwartz@afjlaw.com

**SUPREME COURT OF THE STATE OF NEW YORK**
**COUNTY OF RICHMOND**
ATTORNEY(S) ADVOCATES FOR JUSTICE, CHARTERED ATTORNEYS
225 BROADWAY NEW YORK, NY 10007-3743 | PH: (212) 285-1400

Index Number: 85061/2026

Court Date: 04/30/2026

**WILLIAM CALDARERA**

Plaintiff

*VS*

**NEW YORK SHIPING ASSOCIATION AND APM TERMINALS LLC**

Defendant

## AFFIRMATION OF SERVICE

**DAMIEN MOHRMANN**, the undersigned, affirms and states that deponent is not a party to this action, is over 18 years of age and resides in the State of New York.

That on **4/13/2026**, at **2:22 PM** at **333 THORNALL ST. #301, EDISON, NJ 08837**, Deponent served the within **AMENDED NOTICE OF PETITION, AMENDED VERIFED PETITION AND EXHIBIT A** . On: **NEW YORK SHIPING ASSOCIATION**, Defendant therein named, ( hereinafter referred to as "subject").

By delivering to and leaving a true copy with **ISABELLA** said individual to be **Authorized Agent** who specifically stated he/she was **authorized to accept** service on behalf of the Corporation/Government Agency/Entity/Partnership. A perceived description of ISABELLA is as follows:

**Perceived Gender**: Female    **Perceived Race**: White **Color of hair:** Blonde/Gray    **Age**: 35-45
**Height**: 5ft4in-5ft8in    **Weight**: 161-200 Lbs.  **Other** :

In addition, the recipient described above, would not provide her full name.

I affirm on this day____April 13, 2026____ , under the penalties of perjury under the laws of New York, which may include a fine or imprisonment, that the foregoing is true, and I understand that this document may be filed in an action or proceeding in a court of law.



_____
DAMIEN MOHRMANN

Lic #
JobID    2624415

**Client's File No.:**

*FIRST LEGAL, 225 BROADWAY, SUITE 440, NEW YORK, NY 10007; LICENSE NUMBER: 2127642-DCWP*
*FIRST LEGAL BUYER, INC*

FILED: RICHMOND COUNTY CLERK 04/13/2026 06:10 PM INDEX NO. 85061/2026
NYSCEF DOC. NO. 11 RECEIVED NYSCEF: 04/16/2026

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF RICHMOND

------------------------------------------------------------------------X

In the Matter of

WILLIAM CALDARERA,

                                Petitioner,

             -against-

NEW YORK SHIPPING ASSOCIATION and APM
TERMINALS LLC,

                               Respondents,

Pursuant to CPLR Article 75.

  ------------------------------------------------------------------------X

Index No. 85061/2026

**AMENDED NOTICE
OF PETITION – <u>MAY
4, 2026 3:15 PM</u>**

TO THE RESPONDENTS:

At the direction of the Court, please take notice that the hearing on this Petition is adjourned to May 4, 2026 at 3:15 PM in Part 10 (Judge Ralph Porzio). Argument shall be heard via Teams. The Virtual Courtroom can be accessed via the Part 10 Court Rules  or  paste this meeting link into your browser: https://notify.nycourts.gov/meet/00ttsm.  If that fails please contact the courtroom 718-675-8646.

Dated: New York, New York
       April 13, 2026

                                      ADVOCATES FOR JUSTICE,
                                      CHARTERED ATTORNEYS
                                      Attorneys for Petitioner

                                      By: *Arthur Z. Schwartz*
                                        Arthur Z. Schwartz, Esq
                                      225 Broadway, Suite 1902
                                      New York, New York 10007
                                      (212) 285-1400 office
                                      aschwartz@afjlaw.com

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF RICHMOND

--------------------------------------------------------------------X

In the Matter of

WILLIAM CALDARERA,

                                            Petitioner,

               -against-

NEW YORK SHIPPING ASSOCIATION and APM
TERMINALS LLC,

                                  Respondents,

Pursuant to CPLR Article 75.

--------------------------------------------------------------------X

Index No. 85061/2026

**AMENDED NOTICE OF PETITION – <u>MAY 4, 2026 3:15 PM</u>**

TO THE RESPONDENTS:

At the direction of the Court, please take notice that the hearing on this Petition is adjourned to May 4, 2026 at 3:15 PM in Part 10 (Judge Ralph Porzio). Argument shall be heard via Teams. The Virtual Courtroom can be accessed via the Part 10 Court Rules  or  paste this meeting link into your browser: https://notify.nycourts.gov/meet/00ttsm.  If that fails please contact the courtroom 718-675-8646.

Dated: New York, New York
       April 13, 2026

                                       ADVOCATES FOR JUSTICE,
                                       CHARTERED ATTORNEYS
                                       Attorneys for Petitioner

                                       By:_*Arthur Z. Schwartz*_____
                                         Arthur Z. Schwartz, Esq
                                       225 Broadway, Suite 1902
                                       New York, New York 10007
                                       (212) 285-1400 office
                                       aschwartz@afjlaw.com

UCS-840
(rev. 12/16/2024)

# REQUEST FOR JUDICIAL INTERVENTION

### Supreme COURT, COUNTY OF Richmond

Index No: _____ Date Index Issued: _____

| | For Court Use Only: |
|---|---|
| | IAS Entry Date |
| | |
| | Judge Assigned |
| | |
| | RJI Filed Date |
| | |

**CAPTION**    Enter the complete case caption. Do not use et al or et ano. If more space is needed, attach a caption rider sheet.

William Caldarera

_Plaintiff(s)/Petitioner(s)_

-against-

NEW YORK SHIPPING ASSOCIATION, APM TERMINALS LLC

_Defendant(s)/Respondent(s)_

**NATURE OF ACTION OR PROCEEDING:**    Check only one box and specify where indicated.

**COMMERCIAL**
- ☐ Business Entity (includes corporations, partnerships, LLCs, LLPs, etc.)
- ☐ Contract
- ☐ Insurance (where insurance company is a party, except arbitration)
- ☐ UCC (includes sales and negotiable instruments)
- ☐ Other Commercial (specify): _____

*NOTE: For Commercial Division assignment requests pursuant to 22 NYCRR 202.70(d), complete and attach the **COMMERCIAL DIVISION RJI ADDENDUM (UCS-840C)**.*

**TORTS**
- ☐ Asbestos
- ☐ Environmental (specify): _____
- ☐ Medical, Dental or Podiatric Malpractice
- ☐ Motor Vehicle
- ☐ Products Liability (specify): _____
- ☐ Other Negligence (specify): _____
- ☐ Other Professional Malpractice (specify): _____
- ☐ Other Tort (specify): _____

**SPECIAL PROCEEDINGS**
- ☐ Child-Parent Security Act (specify): ☐ Assisted Reproduction ☐ Surrogacy Agreement
- ☒ CPLR Article 75 - Arbitration    [see *NOTE* in **COMMERCIAL** section]
- ☐ CPLR Article 78 - Proceeding against a Body or Officer
- ☐ Election Law
- ☐ Extreme Risk Protection Order
- ☐ MHL Article 9.60 - Kendra's Law
- ☐ MHL Article 10 - Sex Offender Confinement (specify): ☐ Initial ☐ Review
- ☐ MHL Article 81 (Guardianship)
- ☐ Other Mental Hygiene (specify): _____
- ☐ Other Special Proceeding (specify): _____

**MATRIMONIAL**
- ☐ Contested

     *NOTE: If there are children under the age of 18, complete and attach the **MATRIMONIAL RJI Addendum (UCS-840M)**.*

     *For Uncontested Matrimonial actions, use the Uncontested Divorce RJI **(UD-13)**.*

**REAL PROPERTY** Specify how many properties the application includes: _____
- ☐ Condemnation
- ☐ Mortgage Foreclosure (specify): ☐ Residential ☐ Commercial

     Property Address: _____

     *NOTE: For Mortgage Foreclosure actions involving a one to four-family, owner-occupied residential property or owner-occupied condominium, complete and attach the **FORECLOSURE RJI ADDENDUM (UCS-840F)**.*
- ☐ Partition

     *NOTE: Complete and attach the **PARTITION RJI ADDENDUM (UCS-840P)**.*
- ☐ Tax Certiorari (specify): Section: _____ Block: _____ Lot: _____
- ☐ Tax Foreclosure
- ☐ Other Real Property (specify): _____

**OTHER MATTERS**
- ☐ Certificate of Incorporation/Dissolution    [see *NOTE* in **COMMERCIAL** section]
- ☐ Emergency Medical Treatment
- ☐ Habeas Corpus
- ☐ Local Court Appeal
- ☐ Mechanic's Lien
- ☐ Name Change/Sex Designation Change
- ☐ Pistol Permit Revocation Hearing
- ☐ Sale or Finance of Religious/Not-for-Profit Property
- ☐ Other (specify): _____

**STATUS OF ACTION OR PROCEEDING**    Answer YES or NO for every question and enter additional information where indicated.

| | YES | NO | |
|---|---|---|---|
| Has a summons and complaint or summons with notice been filed? | ☒ | ☐ | If yes, date filed: 03/11/2026 |
| Has a summons and complaint or summons with notice been served? | ☐ | ☒ | If yes, date served: _____ |
| Is this action/proceeding being filed post-judgment? | ☐ | ☒ | If yes, judgment date: _____ |

**NATURE OF JUDICIAL INTERVENTION**    Check one box only and enter additional information where indicated.

- ☐ Infant's Compromise
- ☐ Extreme Risk Protection Order Application
- ☐ Note of Issue/Certificate of Readiness
- ☐ Notice of Medical, Dental or Podiatric Malpractice    Date Issue Joined: _____
- ☐ Notice of Motion    Relief Requested: _____    Return Date: _____
- ☒ Notice of Petition    Relief Requested: Vacate - Decision/Order/Judgment/Award    Return Date: 04/13/2026
- ☐ Order to Show Cause    Relief Requested: _____    Return Date: _____
- ☐ Other Ex Parte Application    Relief Requested: _____
- ☐ Partition Settlement Conference
- ☐ Request for Preliminary Conference
- ☐ Residential Mortgage Foreclosure Settlement Conference
- ☐ Waiver of Court Costs, Fees and Expenses
- ☐ Writ of Habeas Corpus
- ☐ Other (specify): _____

## RELATED CASES

List any related actions. For Matrimonial cases, list any related criminal or Family Court cases. If none, leave blank. If additional space is required, complete and attach the **RJI Addendum (UCS-840A)**.

| Case Title | Index/Case Number | Court | Judge (if assigned) | Relationship to instant case |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

## PARTIES

For parties without an attorney, check the "Un-Rep" box and enter the party's address, phone number and email in the space provided. If additional space is required, complete and attach the **RJI Addendum (UCS-840A)**.

| Un-Rep | Parties — List parties in same order as listed in the caption and indicate roles (e.g., plaintiff, defendant, 3rd party plaintiff, etc.) | Attorneys and Unrepresented Litigants — For represented parties, provide attorney's name, firm name, address, phone and email. For unrepresented parties, provide party's address, phone and email. | Issue Joined — For each defendant, indicate if issue has been joined. | Insurance Carriers — For each defendant, indicate insurance carrier, if applicable. |
|---|---|---|---|---|
| ☐ | Name: Caldarera, William<br><br>Role(s): Plaintiff/Petitioner | ARTHUR SCHWARTZ, ADVOCATES FOR JUSTICE, Advocates for Justice 225 Broadway, Suite 1902, New York, NY 10007, 917-923-8136, aschwartz@advocatesny.com | ☒ YES ☐ NO |  |
| ☒ | Name: NEW YORK SHIPPING ASSOCIATION<br>Role(s): Defendant/Respondent | 333 Thornall St # 301, Edison, NJ  08837 | ☐ YES ☒ NO |  |
| ☒ | Name: APM TERMINALS LLC<br><br>Role(s): Defendant/Respondent | 5080 McLester St, Elizabeth, NJ  07201 | ☐ YES ☒ NO |  |
| ☐ | Name:<br><br>Role(s): |  | ☐ YES ☐ NO |  |
| ☐ | Name:<br><br>Role(s): |  | ☐ YES ☐ NO |  |
| ☐ | Name:<br><br>Role(s): |  | ☐ YES ☐ NO |  |
| ☐ | Name:<br><br>Role(s): |  | ☐ YES ☐ NO |  |
| ☐ | Name:<br><br>Role(s): |  | ☐ YES ☐ NO |  |
| ☐ | Name:<br><br>Role(s): |  | ☐ YES ☐ NO |  |
| ☐ | Name:<br><br>Role(s): |  | ☐ YES ☐ NO |  |

**I AFFIRM UNDER THE PENALTY OF PERJURY THAT, UPON INFORMATION AND BELIEF, THERE ARE NO OTHER  RELATED ACTIONS OR PROCEEDINGS, EXCEPT AS NOTED ABOVE, NOR HAS A REQUEST FOR JUDICIAL INTERVENTION BEEN PREVIOUSLY FILED IN THIS ACTION OR PROCEEDING.**

Dated:  03/11/2026

ARTHUR Z SCHWARTZ
Signature

1146265
Attorney Registration Number

ARTHUR Z SCHWARTZ
Print Name

*This form was generated by NYSCEF*